[Crim. No. 1187. In Bank.—January 30, 1905.]

## THE PEOPLE, Respondent, v. MIGUEL ANTONY, Appellant.

CRIMINAL LAW — MURDER — EVIDENCE — APPEARANCE OF DEFENDANT'S WIFE—HARMLESS RULING.—Where the theory of the prosecution was that the murder with which the defendant was charged was committed on a certain Sunday about one o'clock in the afternoon, and that his wife had participated, a ruling allowing a question of a witness who had seen the wife on the afternoon of that day, as to the appearance of defendant's wife, was harmless, where the answer was that she looked all right.

ID.—ADMISSION OF WIFE'S TRUNK—USE BY BOTH PARTIES—BLOOD-STAINED GARMENTS.—The court properly admitted in evidence the trunk checked by defendant's wife after the homicide, on the evening of that day, where the evidence shows that it was used by both parties, and contained garments admitted to belong to the defendant, which were stained with human blood, which were offered in evidence.

ID.—WIFE SEEN AT DEPOT—HARMLESS RULING.—Where it was shown without objection that the wife of the defendant was at the depot on the evening after the homicide, purchased a ticket and checked the trunk on it to San Francisco, and was with the defendant when he was arrested *en route,* it could not have been material to admit evidence objected to as to when the train left the place of the

homicide that evening, and whether defendant's wife was seen at the depot on that evening.

ID.—MOTIVE OF ROBBERY—MONEY FOUND.—Where the theory of the prosecution that the motive of the murder was the robbery of a large sum of money belonging to the deceased, bags of money found upon the person of the defendant, and also a sum of money secreted in the clothing of his wife, who was arrested and locked up with him, were properly admitted in evidence.

ID.—INSPECTION OF DIAGRAMS BY JUROR—PRESUMPTIONS.—Where diagrams showing the location of the defendants and the location of an adjoining house and of a closet there, behind which the body of the deceased was found, and the location of other adjoining houses, were admitted in evidence and referred to without objection, the inspection of the diagrams by a juror could not be presumed injuriously to affect the defendant, or to show the reception of any additional evidence, in the absence of evidence that the diagrams contained anything not testified to.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial. Benjamin F. Bledsoe, Judge.

The facts are stated in the opinion of the court.

John L. Campbell, and John Brown, Jr., for Appellant.

U. S. Webb, Attorney-General, and J. C. Daly, Deputy Attorney-General, for Respondent.

LORIGAN, J.—The appellant and one Trinidad Figeroa were jointly charged by information with the murder of one Lee Gar, at Needles, in San Bernardino County.

Appellant demanded a separate trial, was convicted of murder in the first degree, and sentenced to death. He appeals from the judgment and an order denying his motion for a new trial.

It is not claimed on this appeal that the evidence was not sufficient to sustain the verdict, but it is insisted that a reversal should be had on account of certain alleged errors committed by the lower court in its rulings during the trial, and upon other grounds specially assigned.

A general statement of the facts will serve to illustrate these points as we take them up.

The appellant and Trinidad Figeroa, his wife, both dissolute characters, in company with Victor Montajo and Maria

Candalaria, arrived at Needles about a month prior to December 20, 1903, the date on which the murder took place. When they arrived at Needles the appellant had but five dollars, of which he gave his wife two, for the purpose of hiring a "crib" for herself and the woman Maria. About a week thereafter appellant and his wife rented a small house in what is characterized by the witnesses as the "Redlight District" of the town, and lived there together until they left Needles, on the night of the day on which the murder with which they are charged was committed.

There resided at Needles a Chinaman named Lee Gar, who conducted a laundry, and whose custom it was to call at the house of defendant every Sunday for the washing. On Saturday, the day prior to the murder, Lee Gar was paid two hundred and fifty dollars in gold, which he placed in his purse with other gold coin contained therein, and it was shown that on Sunday morning, after paying out thirty dollars from his purse, he still had a good deal of gold money in it. On this Sunday—December 20, 1903—Lee Gar took his lunch at a Chinese restaurant in the town, and about twelve o'clock left the restaurant, and was not again seen alive. About half-past twelve of that day the woman Maria Candalaria went over to the house occupied by defendant and his wife to return a borrowed hatchet. Before she reached the door, defendant's wife came out, took the hatchet from her, placed it on the porch, and, directing Maria to come with her, started away from the premises. Maria inquired of her why it was she did not let her in the house, to which she responded that her husband was taking a bath.

At seven o'clock in the evening an officer called at the house of defendant, inquired about Lee Gar, and was told by defendant's wife that he had not been there that day, and that she did not expect him until the next day. During his visit he observed that a piece of matting had been cut away from the kitchen floor. Late that night the defendant and his wife left Needles for San Francisco, taking with them a trunk, which was checked by the wife on her ticket, and on the afternoon of December 21st they were both taken into custody on the train at Bakersfield.

About eight o'clock on Monday morning, December 21st, the body of Lee Gar, with the throat cut, was found by search-

ers, shallowly buried beneath a mound of sand, back of a water-closet on the premises which had been occupied by defendant. There was nothing found in his pockets except a silver watch, twenty-five cents in money, and a bunch of keys. In the vault of the closet was found a roll of matting tied with shoestrings. This piece was similar to that with which the kitchen floor of the house occupied by defendant was covered, and was undoubtedly cut from it. This roll when opened was found clotted with blood, and within its folds was found a razor, also covered with blood, and evidently the weapon with which the murder had been committed. Blood-stains were also found in the kitchen in the vicinity of where the matting had been cut. In the vault was also found the purse in which the deceased carried his money, but empty. In the trunk which had been checked to San Francisco, were found a pair of pants, an undershirt, shoes, and other articles admitted to belong to defendant, stained with human blood.

This recital does not contain all the incriminating evidence against the defendant appearing in the record, but is sufficient to present the general features of the case, to be supplemented by reference to other items, if necessary, as the points made are discussed. There is nothing in the bill of exceptions showing that any evidence was offered on behalf of defendant.

Now, as to the points urged for reversal.

1. The woman Maria Candalaria was called as a witness, and testified that about three o'clock in the afternoon of Sunday, December 20th, the defendant and his wife called at her house. She was asked as to the appearance of defendant's wife when they arrived—how she looked. That the court permitted this inquiry, over the objection of counsel for the defendant, is urged as error. The theory of the prosecution was, that the murder had been committed in the kitchen by the defendant, somewhere about one o'clock on this Sunday, and that his wife had participated in it, and the question was doubtless asked with a view of showing from her appearance a consciousness of guilt. But, if it be conceded that the question was improper, the defendant was not injured by it, because the witness answered that "she looked all right." The error, assuming it was such, was harmless.

2. It is insisted that the court erred in admitting in evidence the trunk which defendant's wife had checked to San

Francisco. The point is, that it was his wife's trunk, and that its admission had no bearing in the case. There is no merit in this claim. The evidence shows it was used by both parties, but, aside from this, the offer did not so much relate to the trunk as to its contents, which consisted, in part, of the blood-stained garments of defendant which were found therein, as heretofore stated, and which were offered in evidence.

3. Objections were made to inquiries as to when a certain train left Needles on the night of December 20th, and whether defendant's wife was seen at the depot on the evening of that day. This may or may not have been material, but if it was not, it is difficult to perceive how defendant was injured by it. It is shown, without objection, that his wife was at the depot that evening, purchased a ticket, checked the trunk on it, and was in the company of the defendant when arrested at Bakersfield.

4. When the officer arrested defendant and his wife at Bakersfield he took them to the county jail and searched them. He found on the person of defendant a canvas or buckskin sack purse containing eighty dollars in gold and less than five dollars in silver, and in the hand-purse of his wife sixteen or eighteen dollars. After locking them up, he entered the cell occupied by the defendant's wife, took off her shoe, and found, concealed in her stocking, a buckskin pouch containing sixty or seventy dollars.

Counsel for defendant objected to the testimony relative to the last search and the discovery of this money on the person of the wife, and insisted that it was error on the part of the court to have permitted its introduction.

But when we consider the evidence in the case before the jury up to this point, we do not think the defendant was prejudiced by the testimony relative to this search, or that he has any cause to complain of it. The evidence at this stage of the case showed that the defendant and his wife had been arrested and lodged in jail at Bakersfield; that when Mr. Lane and Mr. Medlin, officers of San Bernardino County, went to the county jail at Bakersfield in Kern County to bring defendant and his wife to San Bernardino County, they brought back two bags of money, which the sheriff of Kern County delivered to them, together with the prisoners. These bags were delivered to the jailer of the county jail of San Ber-

nardino County, when the defendant and his wife were surrendered to him by Lane and Medlin, and when called as a witness the jailer testified: "The money that I received from Mr. Lane and Mr. Medlin consisted of three twenty-dollar pieces, four ten-dollar pieces and eleven five-dollar pieces, and some silver, amounting altogether to $167.70. The money was in two different bags and the amount was about equally divided between them. I had a conversation with the defendant, either the same day he came or the next day after, about this money, and he said it was his money."

The theory of the prosecution was that the motive for the murder of deceased was robbery. In support of that theory the state had introduced evidence tending to show the possession by deceased, on the day he was murdered, of a large sum of money; that the purse in which he carried this money was found empty in the vicinity of where his body was buried; that defendant had but five dollars when he reached Needles; that shortly after his arrival there he began to work in the roundhouse of the railroad company, and had worked there until December 15th, when he quit. It was proper to show, under these circumstances, that when arrested the next day, the defendant was in possession of a large sum of money, independent of the $41.40 which the tickets for himself and wife from Needles to San Francisco had cost. The jury would have a right, with this evidence before them, to determine whether it had a tendency, taken in connection with the other evidence of the case, to connect the defendant directly with the perpetration of the crime with which he was charged, and also to disclose a motive for its commission, and, in that regard, it was for the jury to determine whether the money which was in possession of the defendant on the day succeeding the killing of Lee Gar was the fruits of his murder.

Having admitted the possession of this money, the testimony objected to only went to show the circumstances under which it was found. That testimony showed that part of it was in his immediate possession; part of it secreted about the person of his wife. The fact that she was in possession of a portion of it, under his statement that the aggregate amount taken into possession by the jailer at Bakersfield was his, did not affect the right of the state to prove the circumstances under which it was taken into possession by the officers. As

far as defendant was concerned, having previously admitted that all of it was his, the proof of possession by his wife at the time of her arrest of a portion of it only tended to show that he had delivered it to her for secretion or custody.

5. The next error assigned is in denying defendant's motion for a new trial, on the ground that the jury "received evidence out of court other than that resulting from a view of the premises," in violation of subdivision 2 of section 1181 of the Penal Code.

It appears that after the noon recess of court, and on the last day of the trial, while the jury and counsel for both sides were awaiting the arrival of the judge to resume the session, one of the jurors left the jury-box, and stepped over and casually inspected a couple of diagrams, which, upon the first day of the trial, had been admitted in evidence, and were tacked to a blackboard in view of the jury. These diagrams purported to show the house where defendant resided when the murder was committed, and the location of certain articles of furniture therein; also, the location of an adjoining house, and the location of the closet behind which the body of the deceased was found. There are no copies of the diagram in the record, but the testimony of the draughtsman who made them showed what was intended to be represented upon them. These diagrams were admitted in evidence without objection, and there was no suggestion made that they did not accurately and properly show upon their face everything that they purported to represent. During the trial they were constantly referred to by the witnesses in the case, and the objects and articles shown upon them were pointed out and referred to for the benefit of the jury, without any objection thereto upon defendant's part.

It is unnecessary to discuss whether, under these circumstances, the jury had not the right to examine the diagrams, because, even if they did not, it is not shown in what possible way the inspection of them by the juror, as complained of, could have injuriously affected the defendant. Counsel in his affidavit stated that the diagrams purported to represent "not only the house in which the homicide occurred, but the surrounding premises, including an outhouse or closet in which was found some of the material objects introduced in evidence; that there was also upon such diagram represented

a building occupied by parties other than defendant." As far as the location of the closet is concerned, there is no question but what it was accurately indicated upon the diagram, and was frequently referred to, and pointed out by witnesses during the trial, and it cannot be claimed that by looking at the diagrams the juror obtained any additional evidence relative to it. It is not suggested what the "surrounding premises" were, or what the "building occupied by parties other than the defendant" was, or how the delineation of these things upon the diagrams, and the inspection of those diagrams by the juror, could have affected the defendant. For aught that appears, it was pertinent and material to a proper presentation of the case upon the part of the prosecution that the situation of surrounding premises, and other buildings in proximity to the house occupied by defendant, should be shown on the diagrams, so that evidence produced before the jury relative to them might be clearly illustrated and understood. An examination of the bill of exceptions shows that testimony relative to premises other than those occupied by the defendant, and relative to other buildings than the house he lived in, was given in the case without objection, and was pertinent evidence. Now, if aside from these surroundings and buildings, so testified to, there were other premises or buildings indicated upon the map, concerning which no testimony was given, and which the inspecting juror should not have seen, it was incumbent on defendant, in support of his motion upon the ground urged, to show that from an inspection of the diagrams by the juror he received evidence of something that had not already been testified to, or that he acquired thereby some additional evidence. It was necessary to make such a showing, in order to authorize the court to award a new trial upon the ground urged, and, having failed to make it, for that reason alone the motion was properly denied.

6. The last point urged by appellant is, that certain objects introduced in evidence during the trial—the blood-stained clothing of defendant, the matting and razor found in the closet, etc.—were not properly before the jury for consideration, or use by the district attorney during his argument, because, when offered and received in evidence, they were not then "exhibited to the jury," within the provisions of section

1954 of the Code of Civil Procedure. There is nothing in this point, and it is made in face of the record, which shows explicitly that they were so exhibited.

We have discussed 'and disposed of every point made by appellant, and, finding no error in the record, the judgment and order are affirmed,

McFarland, J., Henshaw, J.; Angellotti, J., Van Dyke, J., Shaw, J., and Beatty, C. J., concurred.