## POLK ADAMS v. THE STATE.

### No. 3114.   Decided June 23, 1905.

**1.—Murder First Degree—Charge of Court—Reasonable Doubt.**

Where the charge in a trial for murder, taken as a whole, applies the reasonable doubt to each issue of the case and instructs the jury among other things if there was a reasonable doubt as to whether defendant did the killing to acquit him, there was no error in also charging the jury to the effect that if they found that one M. or any other person other than defendant cut the deceased with a knife which resulted in his death to acquit defendant, omitting to apply the reasonable doubt. Following Powell v. State, 28 Texas Crim. App., 393; Edens v. State, 41 Texas Crim. Rep., 522.

**2.—Same—Charge Refused—Defense of Another—Alibi.**

Where in a prosecution for murder the evidence showed that defendant fatally cut deceased with a knife while a third party advanced upon the latter with a pistol, or during the conflict between them, and the defense was an alibi, there was no error in refusing to instruct on the law of· defense of another; the evidence not warranting an instruction of self-defense had the said third party been on trial; and besides the defendant did not interfere as a peacemaker or in defense of the said third party, according to the evidence, but entered the difficulty to avail himself of· the opportunity to kill deceased, and that he knew the situation and how it was brought about. Davidson, Presiding Judge, dissenting.

**3.—Same—Charge of the Court—Means Used—Harmless Error.**

Where the indictment charged that defendant killed deceased by cutting him with a knife, it was harmless error for the court to charge in the latter portion of his charge that the jury could not find defendant guilty of killing

deceased by striking him with a pistol, unless they further found that he killed him as previously instructed, that is, unless defendant killed deceased by cutting him with a knife, and that any other method of killing him could not be considered by the jury; besides the evidence showed that defendant only inflicted a superficial injury by a blow with a pistol.

**4.—Same—Evidence—Clothing of Deceased.**

While in a prosecution for murder the clothing of deceased should not be introduced unless it has some pertinent bearing upon the trial of the case, there was no error to admit this character of evidence in a case where the cuts in the clothing might indicate with reasonable accuracy the size of the weapon used in making them, although defendant raised no issue on this point; the State having the right of establishing that theory by positive and unequivocal evidence. Distinguishing Cole v. State, 45 Texas Crim. Rep., 225; Christian v. State, 46 id. 47; Melton v. State, 11 Texas Ct. Rep., 745.

**5.—Same—Change of Venue.**

Where the evidence did not show a condition of public sentiment such as would deprive defendant of a fair and impartial trial in the county of the trial, there was no error to refuse the motion for change of venue.

**6.—Same—Misconduct of Jury—Deputy Sheriff—Officer De Facto—Harmless Error.**

Where the record showed that a deputy sheriff who was in charge of eight of the jurors, pending the selection of the full panel, told them about a difficulty that had occurred between one of the defendant's witnesses and one D., in which the latter arrested said witness, took a pistol from him and struck him over the head inflicting a wound; and the record further showed that said witness testified to matters that do not appear to have been controverted to any serious extent by the State upon any material portions thereof, and there was no showing how defendant's rights could have been injured, there was no error in refusing a new trial on this ground; and it was immaterial in this connection whether the deputy had taken the required oath as such and filed his appointment. Davidson, Presiding Judge, dissenting.

**7.—Same—Fact Case—Charges of the Court.**

See opinion for evidence sufficient to sustain a conviction of murder in the first degree, and where the charges submitted by the court were applicable to the facts in the case.

Appeal from the District Court of Llano. Tried below before Hon. Clarence Martin.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Slater & Oatman* and *Will G. Barber,* 1or appellant.—A charge which requires the jury to find the existence of a defensive proposition as a condition to an acquittal is not a proper nor sufficient submission of the defense. The charge should have been that if R. H. Moseley, or any other person, cut and killed Yoe, defendant would not be guilty, and that if the jury had any reasonable doubt on this point they must acquit defendant. Shamburger v. State, 24 Texas Crim. App., 433; Johnson v. State, 29 Texas Crim. App., 150; Johnson v. State, 30 Texas Crim. App., 419; Moore v. State, 28 Texas Crim. App., 377; Bennett v. State, 30 Texas Crim. App., 341; Williams v. State, 24 Texas Crim. App., 342; Harvick v. State, 18 S. W. Rep., 677; Stanfield v. State, 62 S. W. Rep., 917; Cogdell v. State,

63 S. W. Rep., 645; Giles v. State, 71 S. W. Rep., 961; Bennett v. State, 75 S. W. Rep., 314; Vann v. State, 77 S. W. Rep., 813; Scott v. State, 79 S. W. Rep., 543; Williams v. State, 79 S. W. Rep., 521.

The evidence clearly raised the issue of Moseley's right to have slain Yoe in self-defense. Moseley having such right, Adams, in slaying Yoe, would be justified in same manner and to same extent as Moseley, and the jury should have been so charged. Penal Code, arts. 675–676–679; White's Penal Code, sec. 1163; Kendall v. State, 8 Texas Crim. App., 569; North v. State, 12 Texas Crim. App., 111; Dyson v. State, 14 Texas Crim. App., 454; Sterling v. State, 15 Texas Crim. App., 249; Ashworth v. State, 19 Texas Crim. App., 182; Bonner v. State, 29 Texas Crim. App., 223; Glover v. State, 26 S. W. Rep., 204; Butler v. State, 26 S. W. Rep., 201; Garcia v. State, 57 S. W. Rep., 650.

A defendant as a witness stands on same footing as any other witness. His evidence does not take out of the case an issue raised by other evidence, no more than does the evidence of any other witness. He is entitled to have submitted a defensive theory fairly raised by any of the testimony, although inconsistent with his own. Bonner v. State, 29 Texas Crim. App., 223; Giles v. State, 67 S. W. Rep., 411; McComas v. State, 75 S. W. Rep., 533; Venters v. State, 11 Texas Ct. Rep., 613; Sewell v. State, 32 Texas Crim. Rep., 482.

Even though Adams may have entertained malice toward Yoe and have been actuated in part thereby in killing him, he would yet be justified if actuated also by a purpose to prevent Yoe slaying Moseley. Shumate v. State, 42 S. W. Rep., 600. C. S. Stoudenmeir, who was placed in charge of the eight jurors first empaneled in this case, was not a proper officer to attend said jurors, as he was neither a de jure nor de facto deputy sheriff. Code Crim. Proc., art. 692; Brown v. State, 66 S. W. Rep., 547; Shannon v. State, 65 S. W. Rep., 1065; Woodson v. State, 51 S. W. Rep., 918.

If said C. S. Stoudenmeir was a proper officer to be placed in charge of said jurors, then he should not have been permitted to converse with them, and especially should not have been permitted to converse with them about matters having a bearing on the case on trial. Code Crim. Proc., art. 690; Hogan v. State, 28 S. W. Rep., 949.

We wish to present, as clearly as we may, first our view upon the holding of the majority of the court that appellant could not invoke the right to defend Moseley, since the evidence showed no self-defense in favor of the latter. As we are irresistibly impressed with the feeling that the court has cut loose from the law as it has always been thought to be, we wish to preliminarily call again to the court's attention, for such consideration as your Honors may see fit to give same, the views announced by eminent judges on other occasions bearing upon when a trial court must submit an issue to the jury and upon the degree or extent of proof necessary to make an issue.

Among the earlier utterances by this court we may note the language

of Judge White in Scott v. State, 10 Texas Crim. App., 112; where he says: "The rule is that the court, in felony cases, must apply the law by a proper charge to every conclusion deducible from the evidence, whether asked or not. If there is any evidence tending, though slightly, to establish a defense, the defendant is entitled to a charge directly upon that point, no matter what view the court may entertain of the weight and value of the testimony." And of Judge Hurt in McLaughlin v. State, 10 Texas Crim. App., 340; as follows: "We are not to be understood as holding that defendant is not guilty of murder or that he is guilty of manslaughter. We are treating of the charge of the court, and not the guilt or innocence of the defendant. Every theory presented by evidence in the case demands of the court a charge thereon, whether strongly or weakly supported by the testimony. If there be evidence tending to support it, the law must be directly and pertinently applied thereto. The jury, and the jury alone, must pass upon the strength of the evidence which tends to support the theory. Nor can the evidence be so full and complete in favor of one theory, as to preclude evidence, or excuse the court in refusing or failing to charge the law, relative to another theory."

And again, a member of the present court, in Parker's case (36 S. W. Rep., 266), says: "It has been repeatedly held by this court that it is the duty of the trial judge to give in charge to the jury every phase of the case raised by the testimony in favor of a defendant, however improbable or unreasonable the testimony may appear to the judge."

Not alone this court, but the Supreme Court of this State, recognizes this to be a firmly established rule of practice. Thus, in Lee v. Railway, 89 Texas, 583, Judge Brown puts it, "to authorize the court to take the question from the jury, the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." And in Choate v. Railway, 90 Texas, 81, the same court, referring to the rule stated in the Lee case, held a question was made for the jury since the evidence was "not such as to preclude a difference of opinion." The Courts of Civil Appeals follow the rule (Garza v. Railway, 41 S. W. Rep., 172; Lindsay v. Murphy, 48 S. W. Rep., 531). It obtains universally so far as we have observed. For instance, the Supreme Court of Alabama, in Gibson v. State, 18 Am. St. Rep., 96, says a prisoner is entitled to have submitted every issue made by "any evidence, however weak, insufficient or doubtful in credibility."

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

The first error discussed in appellant's brief is the following por-

tion of the charge of the court: "Should you find that R. H. Moseley, or any other person other than defendant, cut deceased Clyde Yoe with a knife, which resulted in the death of deceased Yoe, then you will acquit defendant, and return a verdict of not guilty." Appellant's objection to this charge being that the same was on a defense urged; that is, that R. H. Moseley, or some other person than defendant, cut deceased Joe, and said charge failed to instruct the jury that if they had a reasonable doubt that R. H. Moseley, or some other person than defendant, may have cut deceased, then they should find defendant not guilty, but said charge required the jury to find affirmatively that R. H. Moseley or some other person than defendant, cut deceased Yoe with a knife, which resulted in the death of Yoe, before they would be authorized to acquit defendant.

The charge must be considered as a whole, and the prior clause thereof reads, as follows: "If you find that defendant did not cut deceased Clyde Yoe with a knife, or if you have a reasonable doubt as to whether or not he cut deceased with a knife, you will return a verdict of not guilty." This certainly cures any supposed error in the charge. Powell v. State, 28 Texas Crim. App., 393; Edens v. State, 41 Texas Crim. Rep., 522; 55 S. W. Rep., 815. Appellant's contention is correct that the reasonable doubt must be applied to each and every issue, and if there was a doubt as to whether some one else did the killing, or if the issue is presented of some one doing the killing other than appellant, then of course it is the duty of the court to apply the reasonable doubt to this issue. We understand the charge here complained of does this when the charge is considered as a whole. It appears that the killing for which appellant was tried and convicted, occurred on the sidewalk in front of the Llano Hotel, in the town of Llano; in which difficulty deceased, Clyde Yoe, was killed; and also R. H. Moseley. The evidence conclusively establishes the fact, we take it, that Moseley was killed by Claude Yoe. Appellant insists that the evidence shows that, if he cut Clyde Yoe with a knife and killed him, it was in defense of Moseley upon whom the deceased was making a deadly assault.

In appellant's brief, he collates the following facts from the record: "On the evening and before the shooting, Yoe applied to Walter Roberts for a pistol, but there being nothing but 'popguns' in the store, he did not take same. Next he goes to the Weeks' drug store to borrow Weeks' gun. In the absence of Weeks, his clerk (Holden) objected to his taking the gun; but he did so anyway, and sitting down examined it to see that it would work. Being asked if he was going to make an arrest, he says, 'No, it's a personal matter, or affair, of mine.' Some thirty or forty-five minutes before the shooting, Moseley, Yoe, Adams, Biles, Hall and others were in the Klondyke Saloon, drinking. After taking a drink, Moseley left and was at the hotel when the other parties reached there. The parties remaining in the saloon were laughing and 'guying' each other. Presently Yoe invites

Hall to go to supper with him, and he in turn asks Biles to go, and the three, with others, start out to supper. Corbett and Biles, witnesses for defendant, relate also what occurred at the saloon, and show that the party went to the hotel, where Yoe registered all of them as with him. Moseley was there already. Up to this time there is no evidence of any trouble or unfriendliness between Yoe, Biles and Moseley or any two of them. Biles and Moseley, in talking about one Wyckoff getting his eyes blacked at the race track, used some oaths. The proprietor protested, and the parties apologized. This led to Biles proposing that they go to the restaurant, and they started. While waiting for Hall to telephone his wife, Yoe tried to get the parties to come back and get the supper already ordered. Biles said no, he would go to the restaurant. Yoe seems to think they are mistreating him, and so expresses himself. Biles said, 'What was said was not intended for you, but if you take it that way, I can't help it.' Yoe jumped back, threw his gun on Biles, who was unarmed, and cursed him violently, until Biles turned and walked away, presumably to get a gun. In the meantime, Shirley, a witness for the State, heard Yoe, before he came out of the hotel office, say, 'if there has to be trouble, let her come.' Coming from the office, he makes the first assault on Biles. From that time until the shooting is all over, Yoe never puts up his pistol. A number of the witnesses for the State and defendant tried unsuccessfully to get Yoe to do so. When these parties would try to go to Yoe he would throw his pistol on them and order them to stop on pain of being shot. Moseley coming back with Scott met Biles, being followed by Yoe with the pistol. Moseley asked Yoe what was the trouble. Yoe, cursing, kept his pistol on Moseley, who kept asking Yoe what was the matter. Hazlett says Yoe was cursing Moseley and told the latter to take his hands off his pistol or he would kill him. Moseley said he had nothing and held up his hands. Adams came up and told Yoe to put up his gun and behave himself, as no one wanted to hurt him. Adams left and Yoe then began firing at Moseley. Foster, for the State, says that when Moseley came up, Yoe ordered him not to come any further, saying, 'You are a friend of Bill Biles, and not a friend of mine.' Moseley said he had nothing against him. Moseley started to put his hand on left hip and Yoe, with cocked pistol at Moseley's breast, ordered him to stop. Moseley said again, 'I haven't anything against you,' and they shook hands. Every witness agrees that Yoe fired the first shot, and Hall says Moseley jumped as if hit the first shot. He also says Moseley drew his pistol, and had it in position to shoot before Yoe fired. On the other hand, Smith, for the defense, shows that Yoe fired his first shot before Moseley even started to get his pistol; that Yoe fired a second shot as Moseley drew his pistol; that Hall knocked Moseley's pistol up as he fired his only shot, and then wrenched same out of Moseley's hands. Only one cartridge was fired from Moseley's gun, and five from Yoe's. Through the witness L. M. Deats the State introduced a declaration of defend-

ant made immediately after the shooting to the effect that 'Clyde started it and got it stuck to him.' "

Appellant contends that the court should have presented, under the above facts, the issue of defense of Moseley, in behalf of appellant; and complains that the court, in that connection failed to give the following charge: "If from the evidence, you should find that defendant cut and killed deceased Clyde Yoe, but, should further find that at the time he did so (if you find that he did cut and kill said Yoe) it reasonably appeared to defendant by the acts of the said Yoe, or by the words, if any, of said Yoe coupled with the acts of said Yoe, that it was the purpose and intent of deceased Yoe to murder Moseley, and that defendant cut and killed deceased Yoe while said Yoe was in the act of murdering the said Moseley, and that said act of cutting and killing said Yoe (if he did cut and kill him), took place before the said Yoe had actually murdered the said Moseley, and that defendant so cut and killed the said deceased Yoe solely for the purpose of preventing the said Yoe from murdering the said Moseley, then you will find the defendant not guilty." Appellant further complains that the court failed to give the following instruction: "If from the evidence you find that defendant cut and killed deceased Clyde Yoe, but should further find that at the time he did cut and kill deceased Yoe (if you find that he did cut and kill him) that deceased Yoe had made a felonious assault upon one R. H. Moseley with a pistol with the intent to kill him, the said Moseley, and that, if he, said deceased Yoe, had thereby killed the said Moseley, the said deceased Yoe would have been guilty of murdering said Moseley, and defendant cut and killed deceased Yoe solely for the purpose of preventing him, deceased Yoe, from murdering said Moseley, then you will find defendant not guilty." We do not think that either of said charges were applicable to the facts of this case. In addition to the statement of appellant above copied, we desire to say that the record demonstrates animus on the part of appellant towards deceased, Yoe. Without collating the evidence, we believe that it shows appellant intervened in the difficulty brought about by Moseley, and not by Yoe; and he could not plead that he was acting in the proper defense of Moseley in the difficulty that resulted in Moseley's death. In other words, the evidence shows Yoe had had a previous altercation with one Biles; that deceased Moseley interfered in this difficulty, and insisted upon approaching deceased Yoe, and was only forced to desist by Yoe throwing his pistol down upon him, and forcing him to stop. Moseley threw up his hands, and said he had no pistol, when as a matter of fact he did. Yoe told him not to come on him; that he was a friend of Biles. He persisted in his effort to do so, and finally secured Yoe by the lapel of the coat; they simultaneously drew their weapons and began shooting. It is true that the record shows deceased Yoe shot first; and it is further true that he fired more shots than Moseley; but the record clearly demonstrates this was not Moseley's

fault, since he was endeavoring to shoot, and parties interfered and took his pistol from him. If this had not been done, evidently he would have killed Yoe before the wounds inflicted by appellant upon him (Yoe) with the knife resulted in his death: at any rate he would have inflicted upon deceased Yoe, deadly wounds in conjunction with appellant. The difficulty seems to have been an unwarranted drunken row between all parties, brought about by a trivial matter, as indicated in the statement copied from appellant's brief. Yet, we conclude, after a careful investigation of all the facts that the issue sought to be invoked in behalf of appellant, was not warranted by the evidence. The propositions of law relied upon to support the contention of appellant that he would have the right to defend Moseley to the same extent that Moseley had to defend himself, is true. But we hold that the evidence does not show that Moseley was defending himself. He brought on the difficulty. If he had desisted, and heeded the demand of Yoe, not to come upon him, the difficulty would not have occurred. Certainly the accidental fact that Yoe shot first would not raise the issue of self-defense in Moseley's behalf: he having no self-defense, appellant could not rely upon self-defense of him—appellant being present all the time. In addition to the facts above collated, the record shows that appellant cut deceased with a knife, from which wounds he died. A few moments after the difficulty, he was seen with a bloody knife making threats of vengeance on deceased and other parties. Just as the shooting began, defendant had hold of deceased, and one witness testified, that he heard a noise as if clothing was being cut or torn. The defendant testified to a complete alibi; and does not state anything in his testimony, nor do we think the evidence for the defense at all bears out the idea, that he was acting in defense of Moseley in any respect. Accordingly we hold that neither of these charges are applicable to the facts of this case, and the court did not err in refusing the same.

Appellant also complains of the following portion of the charge of the court: "If you find from the evidence beyond a reasonable doubt, that defendant struck deceased Clyde Yoe with a pistol, you are further instructed that you cannot convict defendant in this case for such action, if you find he did strike deceased, unless you further find that the State has established each of the first four preceding requisites to a conviction on page 7, paragraphs 1, 2, 3, 4, of this charge." Objections to said charge by appellant are that the same instructs the jury that, if they find as in said charge directed, then they can convict defendant for striking deceased Yoe with a pistol, when the indictment charges that the defendant killed deceased Yoe by cutting him with a knife. In the previous paragraphs of the court's charge, the jury are instructed, not to convict defendant, unless he killed deceased by cutting him with a knife; and that any other means or method of killing him could not be considered by the jury. At least this is the substance of the charge. The evidence shows that after deceased was

down on the ground, appellant wrenched the pistol from his hand and violently struck him in the face with the same seriously injuring his nose; but the evidence conclusively shows that this wound did not cause his death, but that the knife stabs did. Now, conceding error, in view of this statement in the charge of the court it could not have injured appellant, since the jury were previously instructed not to convict appellant, save for killing deceased with a knife. They could not have considered he was killed by the blow, since the uncontroverted evidence shows that this wound was a superficial one.

By his eighth bill of exceptions appellant complains that the court erred in permitting the State to exhibit to the jury the pants worn by deceased at the time he was cut and killed. The objections to said testimony being that the introduction of the same did not serve to illustrate or explain anything in the case, as the fact of the cutting, the location of the wound and the extent and character of the wound were in no way put in issue; and the evidence was calculated to inflame the minds of the jury against defendant. To support his contention he cites us to Cole v. State, 45 Texas Crim. Rep., 225; 71 S. W. Rep., 527; Christian v. State, 46 Texas Crim. Rep., 47; 79 S. W. Rep., 562; Melton v. State, 11 Texas Ct. Rep., 745. We there held, as insisted by appellant, that when such testimony does not illustrate and make pertinent some phase of the evidence relied upon by the State for conviction, it is not proper to use the clothes for the mere purpose of inflaming the minds of the jury. The bill of exceptions shows that at the time said pants were introduced in evidence, State's counsel stated he offered the same to show the size of the blade that did the cutting. Appellant's counsel said, they raised no issue on that point. The court overruled said objections, and permitted the introduction of the pants. The bill is approved with the explanation: "That said pants were simply introduced in evidence to show cuts in clothes, and were not further exhibited during the entire trial of the case." While, as stated in said cases, the clothing of deceased should not be introduced, unless it has some pertinent bearing upon the trial of the case, the bill before us does not show that it did not have. It is true appellant says he raised no issue on that point; but this would not preclude State's counsel from insisting upon establishing his theory by positive and unequivocal evidence. Certainly the cuts in the clothing might indicate with reasonable accuracy the size of the weapon used in making them. Furthermore, our attention has not been called to any case where reversible error was held by sheer force of the fact that the clothes were introduced. We would not be understood as holding, however, that a case could not arise. Certainly the bill of exceptions now under consideration does not show such a state of facts as would authorize the reversal of this case.

By the fifth bill of exceptions appellant complains that the court erred in failing to grant his motion for change of venue; and cites us a long array of authorities, in which it is held that the evidence

demonstrated the court erred in not changing the venue. However, a careful review of the evidence here does not show a condition of public sentiment such as would deprive appellant of a fair and impartial trial in Llano County. Therefore, the trial court did not err in refusing the motion to change the venue.

Appellant also complains there was error in the court permitting Stoudenmeir to accompany and guard part of the jury, before the panel was completed. The bill shows that Stoudenmeir was a deputy sheriff and had been acting as such for some time. While said Stoudenmeir was in charge of eight of the jury that had been selected up to that time, he told said jurors about a difficulty that had occurred between James Dunnaway and Bill Biles, a witness for the defense; in which said Dunnaway had arrested Biles and taken from him a pistol, and in making the arrest had struck Biles over the head, inflicting a wound. We do not see in what way this testimony injured appellant. While it was not admissible, it does not show in what way he could have been injured by it. Biles was a witness to matters that do not appear to have been controverted to any serious extent by the State, or if controverted, it was upon immaterial portions of his testimony. Hence we do not think there was error in the ruling of the court. The record shows that said Stoudenmeir had received the appointment as deputy sheriff, but had never taken the oath of office; nor had such appointment been filed or recorded in the office of the county clerk. This would not preclude his serving as deputy in the manner he did.

We have carefully reviewed all of appellant's assignments of error, and do not think any of them authorize a reversal. On the contrary, we believe the evidence amply supports the verdict, and that the charges were applicable to each and every phase of the evidence presented. As stated, R. H. Moseley, with appellant, provoked a difficulty; at least, he took the initiative in bringing about the difficulty with deceased, Yoe, in which difficulty both lost their lives. However, appellant is clearly demonstrated to have been an active participant and coadjutor with Moseley from the beginning to the end of the difficulty. Ostensibly he tried to get deceased Yoe to desist from the difficulty, but very quickly stabs him to death; and then seeks immunity from punishment on the ground that he was in the lawful defense of Moseley. We cannot agree that the evidence is insufficient. It is true, as stated, the evidence is somewhat confused in some phases, but taking it all in all, we are led to the conclusion that appellant was an active participant in the fight brought on by Moseley in which deceased lost his life.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE (dissenting).—I cannot agree to the affirmance of this judgment. The opinion of my brethren recites facts from the brief of appellant's counsel bearing upon the question of self-defense from the standpoint of appellant's legal right to de-

fend Moseley against the attack of deceased, Yoe. An inspection of the statement of facts does show that appellant's counsel have rather understated than overrated favorably to appellant the evidence on this question. There is sufficient testimony stated in the opinion, as taken from appellant's brief, to raise the issue clearly that Yoe was the aggressor on Moseley; and further that Yoe was the originator of practically all the troubles that led up to the homicide. If self-defense was in this case at all, so far as appellant was concerned it was in the defense of Moseley and not of himself. If Yoe was the attacking party and brought about the difficulty which ended in the death of Moseley and himself, then in law appellant would have the legal right to defend Moseley's life; and under the testimony this proposition is presented from two standpoints, (1) that defendant may have been present and saw Yoe precipitate the difficulty and fire the first shot, and continue firing; and (2) if he was not present at the difficulty, and saw Yoe shooting at Moseley and believing that Yoe was the aggressor and killing appellant's friend Moseley, he had the right to interfere; and his ground of self-defense would be the same as if the facts were true that Yoe was the attacking party. This has always been the law in Texas, and nowhere in our decisions has it been more tersely and more cogently placed than in the opinion by Judge Clark in Guffee v. State, 8 Texas Crim. App., 187. On this phase of the testimony this case, in my judgment, is brought clearly and unequivocally under the rules laid down in the Guffee case, where one party interferes in the defense of another. Therefore I believe that the charge asked by appellant should have been given. The fact that the jury may not have believed this testimony does not justify a court in refusing to submit the issue raised by the testimony. Nor is this court authorized to ignore the rights of an accused where issues are presented, although they might not believe the testimony suggesting such issues. A party accused of crime is entitled to have the law submitting each issue favorable to his side of the case. No trial can be said to be fair and impartial that omits a charge submitting the issues to the jury which would authorize the jury to acquit, or to minimize the punishment if they believed the theory of guilt.

I further believe that the judgment should be reversed on account of the statements made by the deputy sheriff Stoudenmeir to the eight jurors in regard to the difficulties between the witness Biles and Dunnaway. This occurred in the absence of defendant and his counsel, while the officer had the jury out of the court. This officer went into a detailed statement of the previous troubles and statements between Dunnaway and Biles, as well as the difficulty itself, in which Dunnaway severely beat up Biles with a pistol and placed him in jail. No court would for a moment have entertained the idea of admitting this as testimony to be considered by the jury. Yet it was all before them through this deputy sheriff. I therefore believe that this judgment should be reversed and not affirmed.

ON REHEARING.

February 28, 1906.

HENDERSON, JUDGE.—This case was affirmed at a former day of this court, and is now before us on motion for rehearing. Appellant has filed an able brief, the principal insistence of counsel being that the case should be reversed because of the failure of the court to give his special requested instruction to the effect that appellant had a right to interfere in the difficulty, for the protection and in defense of Moseley; that the facts in the record, chiefly coming from the State's witnesses, show a phase of the case in which Moseley acted in self-defense; and that, if the appellant interfered at all, he did so in defense of Moseley. It is unquestionably sound law that a person may interfere in a difficulty in behalf of a friend who is unlawfully attacked, and he will be entitled to the same rights in the defense of such party as he would were he himself assailed; and we go farther, and assert that one might interfere on behalf of a mere bystander, who is unlawfully attacked, and be subrogated to his rights of self-defense; or he might interfere to separate parties and preserve the peace, and he could defend himself by showing that his acts and conduct were instigated by such purposes only. We agree with appellant's counsel that the right to defend another may be set up, if it arises, whether from the State or defendant's testimony. If it arises from the testimony of the State it may be relied on, although it may conflict with the testimony of the defendant. We deem it unnecessary to cite authorities to support this view. On the other hand, these propositions are equally correct: If a person enters into a difficulty in which others are engaged, and he interferes with knowledge that the party on whose behalf he engages has entered into the fight, not in self-defense, but is himself the aggressor, or engaged in a difficulty willingly and voluntarily, that is, in mutual combat, then he cannot justify himself in becoming a party to said difficulty. Nor can a party interfere in a difficulty, and make himself a party to the combat on the side of one or the other of the combatants, merely out of a reckless disposition to engage in a fight, and thereafter set up self-defense or the defense of another. We understand that appellant in his motion for rehearing assails the facts upon which we predicated our original opinion, to the effect that a majority of the court was mistaken, in declaring that Moseley did not engage in the difficulty with Yoe and fight in self-defense; and he cites some facts from which the deduction is drawn that Moseley did fight in self-defense, and that appellant interfered on his behalf and had a right to so interfere in his protection. In view of the earnestness with which counsel insists on this view of the case, we have examined the statement of facts carefully to see if this inference can be reasonably drawn from what occurred before and at the time of the difficulty. It may be true that there are some isolated expressions in the record that would appear to justify

appellant in his conclusion; but we maintain that these, viewed in the light of all the facts, are dissipated and appellant's theory destroyed. It may be stated in general terms that Clyde Yoe and Moseley had a difficulty about nightfall, in front of the Llano Hotel; they fought with pistols. Appellant, according to the theory of the State, engaged in the difficulty on the side of Moseley, and fought with a knife. After the struggle was over, both Yoe and Moseley were found to be mortally wounded. Moseley was shot to death, evidently by Yoe, and Yoe was cut and stabbed to death with a knife. Moseley did not use a knife. Now, it may be asserted at the outset, that appellant's testimony all tended to show that he did not engage in the difficulty: his theory being an alibi. Oscar Smith, one of appellant's witnesses, testified, that he met appellant just before the shooting, going away from them north toward the Klondyke saloon, as the witness was going towards the difficulty; met him about Lauterstine's store; that he did not see defendant Adams during the difficulty. About the time the difficulty ended he saw some one standing by the parties where they had fallen, near the telephone post. Hazlitt, another witness for defendant, claims to have been present at the difficulty; says he saw defendant come up while Yoe and Moseley were talking. He took hold of Yoe, and told Yoe to put up his gun, and behave himself as nobody wanted to hurt him. Defendant then turned Yoe loose, turned around and walked off down the street toward the Klondyke saloon, and he did not see him any more until just about the time the shooting had ceased, or just a second before it had ceased, when he came by going in the direction of Yoe and Moseley, where they had fallen by the telephone post, and said, "Why don't you separate them?" Appellant himself testified that he was in front of the Klondyke saloon, and barber shop, and heard a disturbance up about the Llano House, and went up there, and saw Moseley and Yoe standing near each other. Yoe had a gun. Yoe said to Moseley as he threw his gun down on him: " 'God damn you I will kill you'; and Moseley held out his hands open, and said, 'I haven't got anything.' I walked up to Yoe's right side, and put my left arm around on his left shoulder, and with my right hand took hold of his hand that had the gun in it, and told Yoe not to shoot the man as he had nothing. Yoe raised his head a little, and then looked up at me, and then let down his hands and the gun and let down the hammer of his pistol. I then turned Yoe loose, and walked off, and thought everything was over and there would be no more trouble; went back to the Klondyke saloon; stepped in, got a drink of water, came out, and the first shot was fired." The Klondyke saloon, it may be remarked, was in the same row of buildings, north of where the difficulty occurred (and as we estimate it, about one hundred feet from where the difficulty occurred at the Llano Hotel.) He further states, that he went up to where the difficulty had occurred, and when he got to where the bodies were, saw B. M. Hall standing by the telephone post with a pistol in his

hand, which he was either trying to put down in his pants in front, or was holding it about the body at about that place: "I reached over and caught hold of one of the parties. I did not know who it was at the time, but afterwards discovered it was Yoe, and gave him a jerk, and jerked him away and tried to get his gun out of his hand. I just caught hold of Yoe's hand by the wrist, which hand had the gun in it, and tried to jerk him loose, and he pulled his hand loose from me. I then grabbed the gun by the cylinder, and was pulling it and jerked it up and down this way. Tried to get the gun out of Yoe's hand and made several jerks and pulls before I got it from him; and then handed it to some one. Yoe then laid over and said, 'I am killed.' Looked over and saw two or three persons around Moseley. I helped to carry Yoe in, as far as the door that leads into the office; and there turned Yoe loose, and went down to Klondyke to try to phone for a doctor." He further stated on cross-examination, that he might have struck Yoe in the face, about the head with a pistol, but if he did, it was unintentional and when he was trying to get the gun away from him; did not know who deceased was when he first got there, and did not know who he (deceased) was shooting at; had no knife about him, except a little pearl handled knife; that he did not cut deceased Clyde Yoe, and had nothing to do with the cutting. We have culled from the record, so far as we have been able to discover, all of appellant's testimony tending to show his attitude in the case. We believe it may be safely asserted that there is nothing in his evidence that would tend to raise the issue of interfering in the difficulty on behalf of Moseley; and if we should find such evidence in the record, it must come from the State's case.

Let us review briefly then, the testimony the record presents upon this issue that comes from the State's witnesses. Shirley testifies as to the beginning of the difficulty between Yoe, Biles and Moseley. It appears from this recitation, that these parties, with some others, had gone to take supper with Yoe at the Llano Hotel. The parties, at least some of them, appeared to be drinking. At the supper table, some disturbance occurred, and the hotel proprietor requested the parties, if they could not keep order, to leave; that they could not get supper there unless they behaved themselves. Some of the parties who accompanied Yoe, suggested that they leave, and go to a restaurant and get their supper. This appeared to have angered Yoe, and he went out with them and protested against their leaving. He and Biles engaged in a wordy altercation on the sidewalk of the hotel. Yoe drew his pistol on Biles, and cursed him. Biles turned and went down the street toward the Klondyke saloon. At this Corbett stepped up to Yoe, and Yoe drew his pistol on Corbett, and told Corbett not to come to him. Corbett said, "For God's sake, put up that pistol, and let's not have any trouble here." Moseley came up, and asked Yoe what was the matter, Yoe made some reply, and Moseley said, "Biles is a friend of mine, and I don't want you cursing him." Yoe told him,

"You want to take it up God damn you." Moseley then placed his hand around like he was going to get a pistol, and then Yoe cocked his pistol, and pointed it towards Moseley's bosom, and told Moseley to take his hand away from there or he would shoot him. Moseley said, "I haven't got any," and Yoe, said, "Yes you have, God damn you." Some one else tried to get to Yoe, and he threw his pistol down on him, and told him to stop. Several tried to get to Yoe, but he invariably threw his pistol on them and told them to stop. During this time Moseley had walked out into the street, about ten steps and some one was there talking with him. About this time witness looked around towards Moseley and saw him pull his pistol from somewhere near the front and place it under his coat behind him. He then turned around, and walked towards where Yoe was. Before Moseley had drawn his pistol and placed it behind him under his coat, deceased Yoe had backed towards the west window in the southwest room of the hotel, and was standing near said window. About the time witness told Yoe to put up his pistol, Polk Adams walked up and started to Yoe, and Yoe told Adams to stop, and cocked his pistol when he told Adams to stop. Defendant Adams, then slipped around, and put his arms around Yoe, and took hold of Yoe's pistol. Hall said to Adams: "Turn him (Yoe) loose, the other man has got a pistol;" and defendant then turned Yoe lose and stepped back. This witness further relates that at this juncture he saw Moseley coming towards Yoe, and took hold of him, and Yoe caught Moseley with his left hand. Moseley said something, but witness could not tell what it was. Then Yoe fired, and Moseley fired. They both fired almost together, but Yoe fired the first shot. The parties then fought until they got off the sidewalk, and both fell near the southwest corner of the hotel near the telephone pole. Defendant, after they had fallen, went up to where they were, and took Yoe's pistol from his hand, and struck him two or three times on his face and head. Adams dropped the pistol, and said he had to do it to get them stopped. This witness further says, he did not see defendant, Adams, after he caught hold of Yoe and turned him loose, and stepped back until after the shooting had ceased. Yoe and Moseley only were together when the shooting began.

Witness Hall testifies that he saw the difficulty: "Yoe was on a plank walk in front of the hotel, and was facing northwest and backing towards the window in the southwest room of the hotel with a pistol in his hand. Moseley was advancing on Yoe, while Yoe was backing, telling him to stop. Yoe said, 'Don't come to me. You are a friend of Bill Biles and not a friend of mine.' Yoe said, 'Take your hand from under your coat.' Moseley at the time had his hand under his coat. He replied, 'He did not have a thing,' and took his left hand from under his coat. Yoe then dropped the muzzle of his six shooter towards the floor. Witness told Moseley to stop; 'don't go to Clyde'; and made one or two steps toward Yoe, intending to get his pistol. Saw defendant at this juncture come up and throw his arm

around Yoe, over Yoe's back. Yoe's arms were down by his side. Said to Adams, take Claude's pistol and I will go to Bob. Started to where Moseley was standing, when Moseley threw his left hand under his coat and drew a pistol. Witness said, 'Don't Mr. Bob; don't go back there.' About this time I looked and saw defendant had thrown Yoe's face around toward the south, and then saw Yoe pull himself around with his face toward the west, and either say 'By God,' or 'My God,' Moseley then started back towards where Yoe and defendant were; had a pistol in his left hand, and reached his right hand over, and either caught his left hand or arm with it like a man was going to shoot, and was holding his pistol in front of him all the time. Just as he got to the edge of the gallery, Yoe fired with his hands down. Defendant still had his hands around Yoe, holding Yoe in front of him. When Moseley and Yoe clinched the firing became rapid between the parties. They scuffled to the edge of the gallery, and as they got off the gallery defendant turned them loose. The parties then scuffled around and fell by the telephone post. Witness asked Yoe if he was shot. He said, 'No, but I am cut all to pieces.' Witness asked him who cut him, and he said 'Polk Adams.' After the difficulty was over, and while the parties were lying by the telephone post, some one said, 'Don't do that,' and defendant said, 'I had to knock them down to separate them.' During the time defendant had hold of Yoe and had his arms around him, witness heard Yoe's clothes rip, which he supposed was caused by his trying to get away from defendant. This was just before the firing began." The witness Cummings stated that when Moseley first approached Yoe, he said, "Clyde what is the matter, tell me your troubles." Tom Foster, another witness for the State, saw the shooting between Yoe and Moseley. This witness describes the transaction pretty much as the two former witnesses. Says he saw a man holding Yoe around the arms; that this man had on a dark coat, and looked to him somewhat like defendant. At the termination of the difficulty heard Yoe say, that Adams killed him. Oglesby, another witness, was present at the difficulty and heard Yoe, who was standing on the hotel sidewalk with his pistol in his hand, point it toward Moseley, say to Moseley, not to take another step toward him. Moseley was then about ten feet distant from Yoe. Yoe then stepped back towards the window, in the southwest corner room of the hotel, still holding his pistol in his hand. At this time defendant came up and took hold of Yoe, put his arm around Yoe's shoulder, and take hold of Yoe's hand that had the pistol in it, and tried to get Yoe's pistol from him. Hall told him to leave his gun alone, as the other man had a gun. Defendant Adams then turned Yoe loose and stepped back away from him. This witness then describes how the difficulty began: "Moseley was some twenty or thirty steps from Yoe, out in the street. He then came back, and held out his right hand to Yoe and said something to him. Moseley threw up his hand with a pistol in it, and Yoe threw up his

hand with a pistol in it, and fired at Moseley. Moseley was on the ground and Yoe on the gallery. Moseley had his pistol in his left hand (he being left-handed) Moseley and Yoe then clinched, scuffled and fell off the gallery. The parties scuffled around towards the telephone post and fell. Defendant came up and grabbed Yoe's pistol and struck him over the head, was straddle of Yoe, like, and holding Yoe's coat. Yoe said, 'Turn me loose, I am dead,' and defendant stopped striking him." This witness says he did not see defendant anywhere from the time he saw defendant take hold of Yoe and turn him loose and step back, before the shooting began, until after the shooting ceased, and he saw him come up and take hold of Yoe.

This is all the testimony on the part of the State bearing on the transaction as to how the difficulty began and what occurred during its progress. If there appears from this any evidence that shows appellant interfered in the difficulty, either to preserve the peace, or to protect Moseley, we fail to discover it. True, Yoe appears to have been on the war-path. He fell out with the parties because of the incident at the supper table; and cursed Biles. He remained in front of the hotel on the sidewalk in a defiant attitude, with his pistol drawn. When Moseley attempted to approach him, he told him not to come to him; that he was a friend of Biles. Moseley told him he was not armed. Yoe told him that he was. There is some testimony in the record showing that Yoe had reason to know he was. Adams is not shown at any time to have commanded the peace. But according to these witnesses, he came up to Yoe at the beginning of the difficulty, when Moseley was approaching him. One of the witnesses describes appellant as slipping around Yoe, putting his arms around him, and holding his pistol. The witness Shirley says, he was told by Hall to turn Yoe loose, that the other man had a pistol. He then turned him loose, without any further effort at this juncture to interrupt the fight. Another witness, while he saw appellant holding Yoe at the time Moseley was approaching him, saw Yoe evidently struggling with appellant, and exclaimed, "By God," or "My God," and at this juncture he heard Yoe's clothes ripping, which at the time he supposed was caused by his trying to get away from defendant. All of these witnesses for the State describe Moseley as advancing towards Yoe, when the fight began, and they appeared to have joined hands and began a regular pistol duel. As stated, Moseley had no knife, and as Yoe was cut with a knife, and thus killed, evidently from all the testimony, the cutting was done while the shooting was going on, or just before, and could have been done, as the jury found, by no one, except appellant, Polk Adams, who did it clandestinely. In his dying breath, deceased Yoe stated that Polk Adams had cut him all to pieces. Appellant himself claims that he did not have a knife at the time, except a little pen knife, yet as many as three witnesses observed him just immediately before the difficulty coming from towards the Klondyke saloon to where the difficulty was brewing with an open knife in his hand,

with the blade up his sleeve, showing evidently that he was bent on mischief and was prepared for it. After the difficulty appellant was seen with something bright in his hand like a knife blade, and with blood on his hands. One witness states that he said, he got this blood on his hand, from carrying Yoe into the house; and to another he stated that he got the blood on his hands trying to separate the parties. Even after the difficulty, when Yoe was helpless, he was found pursuing him, wringing his pistol from him, and beating him over the head with it, under the pretense that he was then trying to separate the parties. Immediately after the difficulty he was found trying to borrow a pistol, stating that he wanted to have some more fun. To one witness he stated, "Clyde started it, and got it stuck to him, and if there are any more that want some I am still here." To another he stated, "Clyde Yoe shot the first shot. I followed him up here and tried to keep it down, and he did it anyway, and got the worst of it, and if he is not dead, God damn him, I hope he will die. Clyde did the cutting, I have the knife right here." To another he stated, as he pushed his way through the crowd at the Klondyke saloon, "They sure had it. I was right in the middle of it, and I sure give them hell," and extending his right hand, said, "See here." This witness saw blood on appellant's hand and some bright instrument which he held in it. These were expressions, among others, that this record shows were made by defendant to witnesses immediately after the transaction, showing that defendant was engaged in it and shows his animus in engaging in the difficulty.

It occurs to us that, notwithstanding the witnesses for the State show that Yoe was acting in a lawless and boisterous manner, and was at the time seeking a difficulty, that Moseley nowhere places himself in the attitude of a peacemaker, except in one or two expressions that might, but for what was subsequently done, be construed in his favor; that is, he asked Yoe what was his troubles and tried to pacify him, when he came up to him, according to one or two witnesses; but immediately, according to the consensus of the testimony of all the witnesses, assumed the attitude of one ready and willing to engage in a difficulty with Yoe, who told him not to come to him or about him, he insisted on advancing upon him, though this conduct was protested against by one or two witnesses, and drew his pistol and fired at Yoe, almost simultaneously with the first shot of the latter. Appellant nowhere, as we regard the record, puts himself in the attitude of a peacemaker. We believe that a fair interpretation of the record shows that Yoe and Moseley fought together willingly, and that a court trying Moseley for killing Yoe, would have been justified in refusing a charge in his favor on self-defense; and consequently that the court was justified in refusing a charge in favor of appellant on the ground that he may have interposed in the difficulty in the justifiable defense of Moseley. No question is raised as to his knowledge as to how the difficulty began, and it must be assumed in the face of this

record, that he entered into the difficulty, knowing the situation and how it was brought about. We do not believe that the law of self-defense or the defense of another anywhere arises from this record. Appellant does not claim to have been an especial friend of Moseley, indeed he claims to have been a better friend of Yoe than he was of Moseley. The law of self-defense or defense of another, was never intended to shelter a man, who according to his own testimony, was not a party to the difficulty but was absent at the time; and who, according to the testimony for the State fairly interpreted, did not enter said conflict for any lawful purpose, but knowing that the difficulty was brewing near the hotel, prepared himself with a drawn knife, with a blade according to the testimony of witnesses, about four inches long: that knife open and the blade up his sleeve, and thus entered upon the scene of the contest, and directly after coming upon the ground, seized one of the parties (Yoe) and without notice, and without the command of the peace, assumed the role of an assassin, and clandestinely stabbed him to death. We do not believe that the law of self-defense was ever intended to cover such a case. Even if it be conceded that there may be some expressions in the testimony of the State's witnesses which gave Moseley the right of self-defense, and that in the trial of Moseley for killing Yoe, the court would be required to present the issue of self-defense, still the manner in which appellant, according to the evidence, entered this difficulty, the part he took, not to protect Moseley, but simply availing himself of the opportunity to kill, by taking advantage of Yoe, would not entitle him to a charge in the defense of Moseley. Accordingly we hold that the court did not err in failing and refusing to give the requested charge on this subject.

It is not necessary to discuss other matters, as they are fully covered in the original opinion; and we would not have entered upon this discussion but for appellant's strenuous insistence through counsel that we misinterpreted the record in the original opinion, and that the same when fairly looked at, tends to show self-defense on the part of Moseley, and that appellant entered the difficulty for his protection.

The motion for rehearing is overruled.

*Overruled.*