(No. 20834.—

THE PEOPLE *ex rel.* Danny Stanton *et al.* Plaintiffs in Error,
*vs.* WILLIAM D. MEYERING, Defendant in Error.

*Opinion filed October 23, 1931.*

THOMAS D. NASH, and MICHAEL J. AHERN, for plaintiffs in error.

Oscar E. Carlstrom, Attorney General, John A. Swanson, State's Attorney, and J. J. Neiger, (Edward E. Wilson, Q. J. Chott, and Grenville Beardsley, of counsel,) for defendant in error.

Mr. Justice Dunn delivered the opinion of the court:

The plaintiffs in error, Danny Stanton and Edgar Smith, filed their petition in the criminal court of Cook county alleging that they were unlawfully deprived of their liberty by William D. Meyering, sheriff of Cook county, by virtue of a warrant issued by the Governor of the State of Illinois dated October 18, 1930, on the requisition of the Governor of the State of Wisconsin, charging the relators with the murder of Jack Zuta in the State of Wisconsin on August 1, 1930. The petition alleged that the relators were not the same persons described in the requisition papers and the warrant and that they were not physically present in the State of Wisconsin during the months of July and August, 1930, and were not there on August 1, 1930, when the crime was alleged to have been committed, and that they were not guilty of the crime and were not fugitives from the justice of the State of Wisconsin. The writ of *habeas corpus* was issued. The respondent made return that the petitioners were detained by him by virtue of the Governor's warrant for each of the relators as described in the amended petition, and copies of the Governor's warrants were filed with the clerk in lieu of the originals as a return to the writ. On a hearing the court ordered the writ dismissed and remanded the relators to the custody of the respondent, and they have sued out a writ of error.

A person charged with crime against the laws of a State who has afterward left the State in which the crime is alleged to have been committed, in whatever way or for whatever reason, and is found in another State, may, under the

authority of the constitution and laws of the United States, be brought back to the State in which he stands charged with the crime, to be there dealt with according to law. When the executive authority of a State whose laws have been violated makes demand upon the executive of the State in which the alleged fugitive is found, producing at the time of such demand a copy of the indictment or an affidavit certified as authentic and made before a magistrate, charging the person demanded with a crime against the laws of the demanding State, it becomes the duty of the executive of the State where the fugitive is found, to cause him to be arrested, surrendered and delivered to the appointed agent of the demanding State, to be taken to that State. Neverthless, the executive upon whom such demand is made, not being authorized by the constitution and laws of the United States to cause the arrest of one charged with crime in another State unless he is a fugitive from justice, may decline to issue an extradition warrant unless it is made to appear to him by competent proof that the accused is substantially·charged with crime against the laws of the demanding State and is, in fact, a fugitive from the justice of that State. Whether the alleged criminal is or is not such fugitive from justice may, so far as the constitution and laws of the United States are concerned, be determined by the executive upon whom the demand is made in such way as he deems satisfactory, and he is not obliged to demand proof, apart from proper requisition papers, from the demanding State that the accused is a fugitive from justice. If it be determined that the alleged criminal is a fugitive from justice, whether such determination be based upon the requisition and accompanying papers in proper form or after an original, independent inquiry into the facts, and if a warrant of arrest is issued after such determination, the warrant will be regarded as making a *prima facie* case in favor of the demanding State and as requiring the removal of the alleged criminal to the State

in which he stands charged with crime, unless in some appropriate proceeding it is made to appear that he is not a fugitive from the justice of the demanding State. A proceeding by *habeas corpus* in a court of competent jurisdiction is appropriate for determining whether the accused is subject, by virtue of the warrant of arrest, to be taken as a fugitive from the justice of the State in which he is found to the State whose laws he is charged with violating. One arrested and held as a fugitive from justice is entitled of right, upon *habeas corpus,* to question the lawfulness of his arrest and imprisonment, showing by competent evidence as a ground for his release that he was not, within the meaning of the constitution and laws of the United States, a fugitive from the justice of the demanding State, and thereby overcoming the presumption to the contrary arising from the face of an extradition warrant. These rules are declared by the Supreme Court of the United States in *People* v. *Pease,* 207 U. S. 100. *People* v. *Traeger,* 340 Ill. 147.

Under section 2 of chapter 60 of our statutes, which relates to fugitives from justice, one of the defenses that can be made against extradition is that the prisoner is not a fugitive from the justice of the demanding State—that is, that he was not physically present in the demanding State on or about the date upon which the offense with which he is charged is alleged to have been committed— and under this section he may have a judicial review of the executive decision by the Governor of the question of fact whether he is a fugitive from justice or not. The question is not, however, to be tried as an original question or as a defense of alibi to the crime with which he is charged. The question to be tried under the writ of *habeas corpus* is whether there is any competent evidence that the prisoner was a fugitive from justice. If there is, the court will not weigh the evidence or try the case. When it is conceded or so conclusively proved that no question can be made that the person was not within the demanding State

when the crime is said to have been committed the court will discharge him; (*Hyatt* v. *New York,* 188 U. S. 691;) but the court will not discharge one arrested under the Governor's warrant where there is merely contradictory evidence on the subject of presence in or absence from the State, as *habeas corpus* is not the proper proceeding to try the question of alibi or any question as to the guilt or innocence of the accused. *Munsey* v. *Clough,* 196 U. S. 364; *Lacondra* v. *Hermann,* 343 Ill. 608.

The Governor's warrants made a *prima facie* case, and the burden of proof was on the plaintiffs in error to show that they were not fugitives from justice and that there was no substantial evidence that they were. To maintain this issue they introduced evidence that on the first day of August, 1930, they were in Chicago from early in the morning until the following morning, having slept there the night of July 31 and the night of August 1 after a fish fry which Stanton testified his mother gave that night for his stepfather. Mrs. Maher (Stanton's mother) testified that she had a fish fry the evening of August 1 in honor of her husband's birthday, which was on the twentieth, the celebration being held on the first because he had two days off—Saturday and Sunday. Stanton was at her home as he testified. On the evening of July 31 her son and his wife, her husband, Michael J. Maher, and his brother and Mr. and Mrs. Gray, played cards at her home. Maher, a police officer, testified that he saw Stanton at his home about noon of the first of August and that he remained there through the fish fry, at which Smith was also present, from about 6:30 or 7:00 o'clock until its close, at about 1:00 o'clock the following morning. Michael McInerney, Mrs. Lottie Dolan, Catherine Dolan, Thomas Dolan and George Gray testified that they also attended the fish fry, and that the plaintiffs in error were there all during its progress until 12:30 or 1:00 o'clock the following morning, and it was admitted for the respondent that James Ma-

her, J. P. Dugan and Mrs. Marie Gray, who were present at the hearing, would testify that they attended the fish fry and that the plaintiffs in error were present. Two neighbors, John Hughes and John McGowan, testified, the former that he saw the plaintiffs in error there in the yard twice on the first, once about 3:30 or 4:00 o'clock and the second time at about 7:00 or 7:30, and that there was a party going on there that night; and the latter, that he saw them three times there in the yard on the first, once about 11:00 or 11:20 o'clock in the morning, a second time at about 3:00 o'clock and the third time about 5:30, and that a party was going on there that day.

The record shows that the murder for which the warrants were issued was committed on the night of the first of August, 1930, after 8:30 o'clock, and the auptosy was held that same night between 1:00 and 4:00 o'clock of the morning of August 2. After the testimony of the participants in the fish fry was heard, the relators called as a witness Emil Hoefs, who testified that he lived in Delafield, Wisconsin, and was a bartender in the Lakeview Hotel, on upper Nemahbin lake; that he was tending bar on August 1, 1930, and saw Jack Zuta, who was killed there that day. He saw him around during the daytime and saw him alive at 8:30 in the evening. Some men came into the place that night and there was some shooting there. About a half hour after that he saw Zuta dead. He knew he was alive until 8:30 on August 1, 1930. On cross-examination he testified that the Lakeview Hotel was about a mile and a half west of Delafield; that he had no business other than tending bar and that had been his business for about the last four years. Before that he was on the police force in Milwaukee. He was discharged by the trial board, after a trial, for drunkenness. He was in the bar-room at the time of the shooting and did not go into the dance hall until half an hour after, because he went to the telephone. He did not see who killed Zuta. On further cross-examination

he testified that after the shooting Mr. Salen, the district attorney of Waukesha county, Wisconsin, was talking to him about the shooting when he brought some pictures up there. He came there one night with the deputy sheriff and met witness. Witness signed something there but he did not know what he was signing. Salen had some pictures with him at the time. Three exhibits were marked on behalf of the respondent as State's exhibits "3," "4" and "5" for identification, and Salen asked whether or not the photograph marked State's exhibit "3" was shown by Salen to Hoefs on October 8, 1930. The answer was that this photograph was shown to him but he told Salen at the time that he did not know the man. And the same thing occurred in regard to exhibit "4." Exhibit "5," the witness said, he was forced to sign by Salen and deputy sheriff Morris. They bothered him for fully a half hour wanting him to sign that piece of paper, and they said it would not amount to anything at all—to just put his name down there, that was all. He said Salen came in there and said, "Sign this, Emil; it's all right." The pictures were lying there and the sheet of paper was lying on the top. He did not say that the picture of the man on the right was the picture of one of the men who was in there. "You afterwards read this affidavit to me and I afterwards read it myself and you told me it would not amount to anything. I read it and then you read it over again, and then you said, 'Never mind that; that's all right.'" He was asked, "Never mind what?" and answered, "That what was written on that paper at the time." He said he was not sworn when he signed it. "You did not ask me to raise my right hand and swear to the truth of it. You did not tell me that you were a notary public." At the request of their counsel the relators stood directly before the witness and counsel asked him to "take a look at these two men; did you ever see them before?" and he answered, "No, sir; I cannot recognize them." He testified that he did not see them on Au-

gust 1, 1930, and could not identify either of them as being the man who came into the Lakeview Hotel that night, and on re-direct examination he testified, "I will swear that they were not; I will swear I never seen them."

The relators here rested their case, and Herman R. Salen testified for the respondent that about two weeks before October 8 he showed Hoefs some police pictures of Stanton on small cards and Hoefs told him that the picture of Stanton looked like one of the men that was in that party. They received some larger photographs and went to see him again and showed him State's exhibits "3" and "4," and he pointed out the picture of Stanton as being the picture of one of the men that came into the bar-room on the night of August 1. Salen then showed him State's exhibit "5" and asked him to read it, and he read it and after a time signed it in Salen's presence. The exhibit stated that Hoefs had been shown the photograph attached to it and alleged to be that of Daniel Stanton, alias Danny Stanton, and that to the best of his knowledge and belief Daniel Stanton, alias Danny Stanton, was a member of the group that committed the murder of Jack Zuta. It was signed "Emil Hoefs" and had attached the certificate that he appeared and acknowledged it before Herman R. Salen, notary public, Waukesha, Wisconsin.

William Drury and John Howe, Chicago policemen, were driving south on Stony Island avenue about noon on September 16 and saw Stanton and Smith in a Ford sedan, going west on Sixty-fourth street. The officers went in pursuit of them and on overtaking them placed them under arrest. Smith was driving the Ford and Stanton was at his side. A loaded .38-caliber revolver was in the pocket of the car door at Stanton's right. Many bullets and slugs had been recovered from the body of Zuta. Two of these were bullets of .38-caliber. The revolver found at Stanton's right hand at the time of his arrest and two .38-caliber bullets found, among others, in Zuta's body were submitted

to Col. Calvin Goddard, a director of the scientific crime detection laboratory of Northwestern University and professor of police science in that university, who fired a test bullet from the revolver, which bullet he recovered and compared with the two bullets taken from the body of Zuta. One of the bullets taken from the body was so battered that a comparison with it was of no value. The other, exhibit "11" in the record, when compared in minute detail with the test bullet, showed markings left by the barrel of the revolver from which it had been fired, indicating to Col. Goddard that both bullets had been fired by the same weapon. Col. Goddard was cross-examined at great length, his testimony occupying over 70 of the 149 pages of the abstract, and its value was attacked both because, as it was claimed, there was no scientific basis for the conclusions which he drew from his comparison of the two bullets, and because he refused to take part in an experiment designed to test his ability to identify bullets with the weapons from which they had been fired. The qualifications of Col. Goddard and the admissibility of such evidence as he gave were considered in *People* v. *Fisher,* 340 Ill. 216, and the evidence was held competent, its value being for the jury to determine. We do not intend to cast any doubt upon the admissibility of the evidence or the qualifications of the witness, but in this case we regard the evidence as immaterial.

Admitting that the revolver found in the car at the time of Stanton's arrest on September 16 was the weapon from which exhibit "11" was fired into the body of Zuta on August 1, this is no evidence that Stanton or Smith was in Wisconsin on August 1, 1930. The car in which the relators were riding at the time of their arrest did not belong to either of them. There is no evidence that the revolver did. It may have belonged to the owner of the car. It was not in the exclusive possession of either Stanton or Smith. Stanton testified he did not know it was there, though the testimony is that the handle of the revolver

was sticking out of the pocket in the car door. The exclusive possession of stolen property soon after it was stolen is evidence that the person in possession is a thief and if unexplained may be sufficient to justify a conviction, but to do so it must be not only exclusive but recent. The possession, to be of any value, must be an exclusive, personal possession on the part of the accused. (*People* v. *Bullion,* 299 Ill. 208; *People* v. *Kubulis,* 298 id. 523.) Here the revolver was not shown to have been in the exclusive possession of either Stanton or Smith. The possession, to be of any value as evidence, must be recent. *People* v. *Bullion, supra; People* v. *Kubulis, supra.*

This was all the evidence in the case.

The Governor's warrant made a *prima facie* case for the respondent. The relators showed that they were not in Wisconsin when the crime was committed, by uncontradicted, unimpeached witnesses whose testimony was neither incredible nor improbable. The law is that the Governor's warrant is authority for the arrest and surrender of the accused person. The statute provides that if the accused claims that he is not a fugitive from justice—that is, that he was not physically present in the demanding State on or about the date upon which the offense with which he is charged is alleged to have been committed—he may have a writ of *habeas corpus* upon filing an affidavit to that effect. This implies that he may have a judicial hearing on that question, not to give him an opportunity to prove an alibi, which is a question to be determined by a court of the demanding State, but to show that he is not a fugitive from justice and there is no evidence that he was. That is the situation in this case. The evidence showing the presence of the plaintiffs in error in this State at the time of the commission of the crime is not questioned in any way. The revolver is too remote. Hoefs' affidavit does not purport to state any fact. All it does state is that to the best of his knowledge and belief Stanton was a member of the

group that committed the murder of Jack Zuta. It is of no value in itself but is mere hearsay. It was not under oath and was not subject to cross-examination. It is not competent evidence on the hearing of the *habeas corpus*.

The contents of the Governor's warrants were not abstracted, and it is argued that therefore the abstract fails to show that it contains all the evidence and the court will presume that the evidence omitted therefrom justified the judgment of the court below. The Governor's warrants were received in evidence. The bill of exceptions shows that copies were filed by the respondent as a return to the writ of *habeas corpus* and are by reference made a part of the bill of exceptions. It was not necessary that the warrants should be offered in evidence. The return of the officer is his pleading in the case, and the issue is made on the petition, the return and any denial of the return or facts pleaded in answer to it by the petitioner. The issue in this case was whether the petitioners were fugitives from the State of Wisconsin, and the return of the respondent raised that issue and put the burden upon them of proving, so conclusively that no question can be made, that they were not within the State of Wisconsin when the crime was alleged to have been committed. On this record they have made that proof. The criminal court should have so found and ordered their discharge from custody.

Plaintiff in error Edgar Smith has died since this cause was submitted and the writ of error, as to him, has abated.

The judgment is reversed as to Danny Stanton and he is ordered discharged from the custody of the respondent.

*Judgment reversed and petitioner discharged.*