THE STATE v. W. J. SHAWLEY, Appellant.—67 S. W. (2d) 74.

Division Two, December 20, 1933.

354

*Jayne & Jayne* for appellant.

*Roy McKittrick,* Attorney-General, *Frank W. Hayes,* Assistant Attorney-General, for respondent.

356

ELLISON, P. J.—The defendant was charged by indictment with murder in the first degree, and tried in the Scotland County Circuit Court. On the first trial the jury disagreed; on the second he was convicted and his punishment assessed by the jury at life imprisonment. He appeals but has filed no brief. His motion for new trial contains twenty-six assignments of error. Such of these as merit consideration will be discussed in the course of the opinion. One challenges the sufficiency of the evidence. As the State's proof was wholly circumstantial, and rests largely on "bloodhound" testimony and the testimony of a ballistics expert, we shall review the facts at some length.

The homicide was committed upon Barnett Baxter, a man thirty-three years old, who resided in Chicago where he was employed in some kind of railroad work. His mother and sister lived on a farm eight miles east of Downing, in Scotland County, Missouri. He had come there to visit them early in August, 1930. About nine o'clock in the evening of the 18th of that month he was seated in the kitchen at the supper table by his mother's side and with an uncle, W. L. Baxter, at the end of the table. His sister Minerva was close by in an adjoining bedroom. The meal was over. His back was close to the south wall of the room and he was facing the open kitchen door reading by the light of two lamps a letter he had written his mother and father two years before. A rifle report sounded outside. The bullet struck Baxter in the right eye, penetrating deep into his brain and killed him instantly.

The sister attempted to telephone the defendant Shawley's family who lived a little over a half mile away and were the nearest neighbors on that telephone line. The telephone was "dead" although it had been used two hours earlier. Later in the evening it was ascertained the wire had been cut. Miss Baxter then hallooed to the closest neighbors, the Charles Smith family, who were on a different telephone line. Mr. Smith came over at once and immediately the news was spread about the neighborhood and a doctor and the sheriff were called. After the lapse of nearly an hour the

defendant Shawley and his daughter Pauline appeared, they having been called from the Smith home; but they did not come until some considerable time after other neighbors living farther away had got there.

When the sheriff arrived he found quite a crowd at the Baxter home. He viewed the remains and proceeded to look over the premises. Minerva Baxter, sister of the deceased, had made a pencil mark on the wall at the place where his head was when the bullet struck him. Also there was a new, small, round hole in the screen door of the kitchen which the family said (and testified) had not been there before. The officers assumed it had been made by the bullet. Subsequent experiments proved a bullet of the caliber used would make a hole of that size and character in similar screen wire. A line sighted through the hole in the screen door to the mark on the wall indicated the direction from which the bullet had come. The door was nearly two feet above the level ground outside and there was a small porch or platform three to four feet wide about a foot beneath the door sill. The bullet hole in the door came slightly more than shoulder high on the sheriff while standing on the platform (he was five feet ten inches tall) which led the officers to conclude the shot had been fired by a person standing on the porch—although there was a mounded cave some five or six feet back from the porch, in the same direction, which would have furnished sufficient elevation for the assassin to have shot from there. The sheriff did not examine the ground around the cave. It was decided to telephone a man at Agency, Iowa, for bloodhounds, and the crowd were requested to keep away from the side of the house whence the shot had been fired.

The kitchen, where the deceased was when shot, was at the back or north side of the house, and the outbuildings were in the rear of that. The house faced south on a road running east and west, and about one-fourth mile west along the road a lane led off south for a little over one-fourth mile to the defendant Shawley's home. Still further west along the east and west road about one-fourth mile, another road led off to the north for a distance of about half a mile where it turned east for a short distance and thence went north again. Where this road continued from that point the State did not show, but the defendant developed on cross-examination that it ran northerly in the general direction of the home of a Conoway family, who lived ten or more miles northwest, near the corner of Scotland County.

The bloodhound keeper, Mr. Rodibaugh, arrived at the Baxter home about two or three o'clock in the morning with two hounds. There is no evidence as to their breeding or pedigree, but in his testimony he called them "bloodhounds" and said they were trained for man-trailing. After a preliminary conference with the sheriff

lasting only about five minutes, one of the two dogs was put on the trail at the kitchen door and platform by Mr. Rodibaugh, the hound-master, and the sheriff. The dog went northwest to the barn; thence to a fence at the corner of the barn lot, where mud was found on the fence brace; thence angling back southwest through a pasture to the east and west road above mentioned. From there the dog followed the road west, passing the Shawley lane without entering thereinto, and continued to the road which went north; thence along the north road to where it turned east, and along the east road for about 100 or 200 yards to a place where the tracks of an automobile were found extending across the road indicating it had moved forward and backward once or twice in turning around. Here the trail ended about one and one-half miles north of the defendant Shawley's home. The two men thereupon returned to the Baxter home, and the houndmaster alone put the other dog on the trail starting at the kitchen door, following the same course, and winding up at the car tracks in the road.

About midnight after the sheriff had telephoned for the blood hounds but before they had arrived, he, Deputy Sheriff John Lough and a neighbor, Mr. Wes Jackson, were sitting in the sheriff's automobile at the Baxter premises, discussing the homicide. They were joined by the defendant Shawley. The three other men were questioning Shawley; and according to the sheriff's testimony Shawley said they were "asking too damn many questions" and got out of the car and got into his own car. Mr. Lough testified that the defendant said they "were asking too damned many questions and were making him nervous, and he got out of the car." Mr. Jackson stated the defendant said "be darned if I don't go get in my own car where I can lay down and rest. You fellows keep asking questions and keep me torn to pieces."

The next morning about daylight another deputy sheriff, Charles D. Miller, the defendant Shawley, a man named Jackson and a boy named Blaine were sitting in an automobile at the Baxter home, talking. Someone proposed that they follow along the telephone line from the house and see where the wire had been cut. All four proceeded west along the east and west road heretofore mentioned. When they got to the corner where the lane turned south to Shawley's home they saw the telephone wire had been cut right at the corner post. The Shawley wire was not on that post and had not been cut.

A car track in the road was discernible at the southwest corner of the intersection. The car had come from the west and turned south (toward the Shawley home). This could be told from the fact that one wheel made a sharper curve out into the road and the other (the rear wheel) cut across the corner. It was sandy ground and the rear wheel had skidded and thrown a little dirt to the north

indicating the car had turned south. The witness Miller said, "Those car tracks are going south." The defendant said: "I would like to know how in the hell you know so damned much," and the witness Miller, explained to him. Then the defendant said: "Of course, I drove through there. I live down there."

The man Jackson and the boy Blaine, who, the witness Miller said, were present when he examined the telephone wire and had the conversation with the defendant Shawley as detailed in the two preceding paragraphs, did not testify, but it appears from the record that a little later in the morning—still, however, before breakfast—the houndmaster, Mr. Rodibaugh, the deceased's brother D. E. Baxter and perhaps the sheriff, likewise made a trip of inspection along the telephone line, the defendant Shawley accompanying them. They found a place where a board nailed to the fence had been pulled off leaving fresh splinters. Mr. Rodibaugh testified the defendant Shawley said the board had been pulled loose when the fence was repaired. Rodibaugh says he replied that it looked like the fence hadn't been repaired for two years. On this occasion the witness thought defendant "spoke crabbed."

Later, about ten o'clock in the morning, the investigators decided to perform an experiment by shooting a rifle bullet through some screen wire. The houndmaster, Mr. Rodibaugh, had already found out that a .38 caliber bullet was too large to pass through the hole in the screen door at the Baxter home. It was known the defendant Shawley had a .22 caliber rifle, but he, in the meantime, after being up all night, had gone home. Mr. Rodibaugh, D. E. Baxter, the brother of the deceased heretofore mentioned, and Mr. Hugh Anderson, a citizen of the county, determined to go to the Shawley home and borrow his rifle. When they got there Rodibaugh went into Mr. Shawley's bedroom and found him in bed. Rodibaugh asked to borrow the gun to make tests through screen wire and the defendant replied: "I am not in the habit of loaning this rifle. A man loaning a rifle soon won't have any. I am the only man that ever fired this gun." But the defendant let him take it. The gun was sitting not far from the bed, at the end of the room. Mr. Anderson, another one of the three men who went to borrow the gun, testified, "When he (Shawley) brought the gun out, he said he didn't like to loan it; that nobody ever used it but him." D. E. Baxter, brother of the deceased, swore the defendant Shawley said: "I don't like to loan it. I have a good rifle. Nobody has shot it but me;" and that he further said, "maybe we can find some screen here."

The rifle was a .22 Winchester automatic, with serial No. 35229. The shell ejector would not work. It was identified and introduced in evidence as an exhibit. When Mr. Rodibaugh got it from the defendant he testified, "I put my thumb in and it left a smudge," which was fresh. The three men took the rifle back to the Baxter

home and shot it into two pieces of screen wire. The holes made were just like those in the screen door of the Baxter kitchen. They also shot some bullets into the cave, recovered them and turned them over to Sheriff Myers. About half an hour later Shawley came over to the Baxter home and the gun was returned to him. At that time, according to one witness, he acted "restless like."

Mainly through the efforts of defendant's counsel on cross-examination, this further fact was brought out. About two or three hours after the above-mentioned experiments had been performed —it was after the noon meal, anyway—the sheriff, the houndmaster, Mr. Rodibaugh, and Deputy Sheriff Charles D. Miller drove to the home of a man named Conoway in the northwest part of the county, some dozen or so miles from the Baxter home and arrested two strangers from Chicago, who were with a woman, for the murder. The woman was Mr. Conoway's daughter and the divorced wife of the deceased Barnett Baxter. One of the two men arrested said she was his wife. These three people had two .22 rifles and a .22 revolver. The rifles were cheap ones, not automatics. The revolver also was a cheap one, not automatic but with a cylinder. These weapons were not concealed. The sheriff brought the two strange men to the county seat, but released them within an hour or so. The defendant sought by cross-examination to elicit the fact that these two Chicago men might have been in the automobile which made the tracks the dogs had come upon the night before, but there is nothing in the record to show this except that the car tracks were found in the road about a mile northwest of the Baxter home, in the general direction of the Conoway home still ten or twelve miles beyond.

All the events narrated in the preceding paragraphs occurred on the night of the homicide and the day following. At this point it is necessary to turn aside from chronological narrative to refer to certain evidence introduced by the State, in part consisting of certain statements made by the defendant Shawley in the nature of threats, and in part advancing a motive for the killing.

D. E. Baxter, the brother of the deceased, said that on an occasion some six months before the homicide defendant Shawley said to his (Baxter's) father, "Dave, if I ever get in any trouble with you or your boys the first thing I would do would be to shoot you." Mrs. Sarah Baxter, mother of the deceased, said the defendant told her a month or more before the homicide that he had shot a man in the corn field; that he didn't kill him, but wouldn't care much if he had. She also said the defendant often spoke about what he would do if it wasn't for the law and the hereafter; that "if it wasn't for the law and hereafter there are a lot living now that wouldn't be," naming several people including some in the neighborhood.

As to the motive. The deceased's father had died late in May before the homicide and he had come home for the funeral services, remaining one or two weeks. On that trip he went with Pauline Shawley, the defendant's daughter, to public gatherings three times. The two families were neighborly and Miss Shawley frequently came to the Baxter home. After the deceased Barnett Baxter returned to Chicago from that trip he and she conducted a correspondence. He wrote her four letters from Chicago dated June 9, June 19, July 7 and July 22. She wrote him three letters dated June 13, June 25 and July 16. In the first of these letters the deceased said he would like to see her again and give her a big kiss. In the letter of June 19 he said he thought a lot of her, asked her if she was still his girl, and told her she needed him to help run the farm and that he would like to go on the farm if he were ready to leave Chicago. In the letter of July 7 he asked her if she had another beau yet. But in the letter of July 22, referring to a statement in one of her letters to him that she was getting tired of staying at home so much without any ''dates,'' he told her he thought she was a good girl and he wanted to be friends with her but that he was afraid she was rather young for him and he might remain in Chicago quite a while, so it would be best for her to go ahead and go with other boys, and not bother about going with him any more. All these letters written by the deceased are addressed to Miss Shawley as ''Dear friend Pauline,'' and all at the close bear letters or marks stated by her in her testimony to be symbols denoting affection and representing kisses. Miss Shawley's letters in reply were decorous but each bore the same symbols or marks as appeared on the deceased's letters.

It was the theory of the State that the defendant was angered because the deceased had jilted his daughter, although she testified they were not engaged and the deceased's mother also was of that opinion. But Mrs. Baxter, the mother, further declared the defendant appeared to be well pleased with the prospective match and said it was better than he ever expected Pauline to do. The deceased came back to Missouri on August 2 for the visit during which he was killed. He was not attentive to Miss Shawley on this second trip, but did go with another girl. About a week or ten days before his death, the defendant Shawley was at the Baxter farm assisting the deceased and the brother D. E. Baxter in putting up hay. The latter testified that while they were so engaged the defendant made light of the deceased, saying: ''You must be soft, blistering your hands pitching hay.'' Later on the same afternoon the defendant said to the witness D. E. Baxter, ''Barnett has quit Pauline,'' and the witness replied, ''Didn't she write him that she was thinking of stepping out and he said to go ahead if she felt that way.''

Further along the same line, as tending to show the defendant's animosity toward the deceased. The rural mail boxes of the two families were located side by side some considerable distance from their homes, and whichever family went for the mail would get it for both families and then telephone the other. Some of the Baxters had gone for the mail the day of the homicide and found a letter and a newspaper in the Shawley mail box; and then had telephoned the Shawleys to come over to the Baxter home and get them. W. L. Baxter, an uncle of the deceased, testified he was out in the yard when the defendant Shawley and his daughter Pauline drove over that evening about half an hour before sundown. Shawley went into the house for the mail and Pauline remained outside in their car. The deceased was working with his automobile at the time. He said something to Pauline and she answered in a way that appeared to displease him. Presently the defendant came out of the house and he and the deceased had a talk, which the witness could not hear; but as the witness approached them they stopped talking, and the deceased turned around with his back toward the defendant. The defendant stood for a fourth to half a minute giving the deceased a cold look.

Now, returning to the events following the homicide. One circumstance relied on by the State, and already mentioned, is that the defendant Shawley did not get to the Baxter home for nearly an hour after news of the killing had been broadcast, whereas other neighbors living farther away had come sooner. The corpse of the deceased was left in the chair he occupied when shot for an hour and a half (presumably until the doctor came). The testimony of Minerva Baxter, sister of the deceased, was that when the defendant arrived he came into the room; looked at the deceased; kept saying, "What is the matter;" that he expressed sympathy to the mother, Mrs. Baxter; and thereafter did not, so far as the witness knew, again come into the room where the deceased was; and did not look at the remains at the funeral.

The deceased's brother D. E. Baxter testified that the evening after the homicide he invited Shawley to go to a neighbor's home for some purpose not disclosed by the record. Shawley declined, saying: "Everybody knows that I am a friend of the Baxters, and if I open my mouth too much, I'll be the next. I am not going to go around too much." The defendant then asked the witness what he was going to do at the neighbor's, and the witness did not tell him. Then the deceased said "Are you a deputy?" Being answered in the negative, the defendant said, "I wouldn't be running around with the officers. I don't want the s—— of ———'s fooling around my place." A day or two after the killing the witness met the defendant in the town of Downing. The defendant said: "Have you heard of the suspicions; have you heard they suspicion me?" The

witness replied in the affirmative and the defendant said, "I have some enemies that started it on me and they had better watch out." About that time the wife and daughter of the defendant came out to the car where he was and the defendant continued, "I have been sleeping with a six shooter and I aim to get them," and then, turning to his wife, he said, "I believe my wife knows I mean business." The witness said he rejoined, "I have been sleeping with a gun too and I have a spot light, and if anyone comes around my house they had better tell me who they are."

The State proved some other statements made by the defendant at and after his arrest, which were thought to throw some light on the question of his guilt or innocence. The Deputy Sheriff Charles D. Miller testified that when Sheriff Myers arrested the defendant (in town) he told him he had a warrant for his arrest on the charge of murdering Barnett Baxter and read the warrant to him. The defendant said, "I thought they were fixing up on me." Upon the arrest of the defendant they lodged him in jail and the witness took his (Shawley's) car and drove out to his home to get his rifle and clothes. He got the rifle, which the defendant's daughter Pauline brought from a bedroom, apparently, and readily turned over to him, but the witness forgot to get the defendant's clothes. When the witness returned to the jail the defendant asked him if he went out and scared his family. The witness said no, he had "treated them nice," but the defendant said "that is a g—— d—— pretty way for a man to do" and then continued, "I was going to say"— but he didn't finish his statement. His attitude on this occasion was hostile.

Later while the grand jury was in session and the defendant was in custody the witness had a conversation with the defendant in the hall of the courthouse. The defendant said: "I want to tell you something. I don't want another damned thing to do with you." Being asked why, the defendant said "You didn't bring my clothes." On this occasion the demeanor of the defendant was "sort of hostile." That same morning the defendant's wife and daughter had been subpoenaed to appear before the grand jury. Mrs. Shawley arrived at the courthouse and the defendant said: "She won't go a step till I see an attorney."

Reverting to events after the homicide, but before the defendant's arrest. Dr. H. E. Gerwig, a physician of thirty years' experience, had been called to the Baxter home the night of the homicide. He returned the next morning and held a post-mortem examination, extracting the bullet from the brain of the deceased. This bullet was preserved by the officers and submitted along with the defendant's rifle to a ballistics expert in Chicago, who testified at the trial where both were introduced as exhibits.

The ballistics expert was Mr. Seth Waird, Associate in Ballistics

of the Scientific Crime Detection Laboratories of Northwestern University at Evanston, Illinois. He was also Deputy Coroner of Cook County, Illinois, and an instructor on the law faculty of Northwestern University. He had had practical commercial experience with arms and ammunition; also with the Remington Arms Company for a time, and was sales manager for a gun concern in Philadelphia which manufactured guns and revolvers. While working for the Remington Company he did expert ballistic engineering work. He had been in the naval service during the World War and after the war was in the Ordnance Department. He said he had been taking courses of study in arms and ammunition since 1922; that he had been familiar with the use of a microscope for fifteen or twenty years; and that he had been consulted by officers and law enforcement agencies of fifteen states regarding firearms, in court cases. He had testified as an expert in many such cases and unquestionably under the foregoing facts was qualified as an expert.

The witness mentioned various types of microscopic devices and photographic equipment used in the laboratories to which he had access; and described the method of manufacturing rifles and of finishing the inside of the barrels thereof. And he said each individual rifle leaves certain markings on bullets fired therethrough such as ordinarily make it possible to determine by the use of a microscope whether a bullet was shot through that particular firearm. The better preserved the gun barrel and the bullet under investigation, the more clear will be the identifying marks on the bullet. The witness identified the defendant's rifle and the fatal bullet offered in evidence on the testimony of the other witnesses heretofore referred to, as the gun and bullet submitted to him for scientific investigation in Chicago by Mr. Raines, the prosecuting attorney, on October 14, 1930. Mr. Waird fired two test bullets through the rifle into cotton waste and recovered them for comparison with the evidence bullet. Also he pushed a bullet through the barrel of the gun with a ramrod. He said the gun barrel was in poor condition and that the evidence bullet had been mashed and twisted, probably in passing through the skull of the deceased, which made identification more difficult; but that on a comparison of the evidence bullet with the test bullets he was of the opinion as an expert that it had been fired through that rifle.

The basis of his opinion was that a sufficient number of microscopic ridges and grooves at different places around the circumference of the evidence bullet—though not all—corresponded with the ridges and grooves on the test bullets to warrant the conclusion that all had passed through the same gun. The comparison was made in this way. The questioned bullet and a test bullet were put under what is called a comparison microscope, which is composed of two microscopes with a common eyepiece, so arranged that the

questioned bullet can be put under one microscope and the comparison bullet under the other, the single eyepiece seeing the upper half of one bullet and the lower half of the other in juxtaposition, practically as if they were one bullet. By rotating the two bullets it can be determined whether the ridges and grooves thereon are in alignment and match in heighth, depth, width and direction, somewhat like matching the grains in a piece of wood that had been sawed in two.

The defendant denied having anything to do with the shooting of the deceased, but admitted the rifle introduced in evidence was his. He and his daughter corroborated the State's testimony that they had been at the Baxter home to get the mail early the evening of the homicide but denied there had been any unfriendly conversation between the defendant and the deceased on that occasion. The defense was an alibi, the defendant, his daughter Pauline, his wife and his mother-in-law swearing that, after the defendant and Pauline had returned to their own home from the Baxter house after getting the mail, the whole family were together that evening until they were notified of the homicide by telephone. They had read the letter and newspaper received in the mail, talked a while, and then all had retired, perhaps about eight-thirty. But the doors of the various bedrooms were open so that the other members of the family would have known it if the defendant had absented himself and committed the murder.

They explained the delay of the defendant and his daughter in getting over to the Baxter home after the homicide in this way. Their telephone line had been crossed with another for two weeks. The other party had the same line ring and was called frequently. The Shawley family was expecting no call at that time of night, and so nobody got up to answer the telephone for some little time. Mrs. Shawley finally answered the telephone. The party calling said to come to the Baxter home as quickly as possible, but did not say why. The defendant and Pauline went over, but Mrs. Shawley remained with her mother, who was eighty-one years old. The defendant and his daughter returned to their own home in about an hour to tell Mrs. Shawley and the mother-in-law what had happened. In a few minutes they went back to the Baxter home and both remained there the rest of the night. The defendant denied he avoided the body of the deceased while at the Baxter home and said, on the contrary, he was one of the men who helped carry the corpse from the chair where it had been left to the bed. He and his daughter both admitted he had had a conversation with the deceased's brother D. E. Baxter at Downing, but denied there was anything unfriendly in it, although the subject thereof was the homicidal death of Barnett Baxter. Defendant also denied he ever said in the presence of D. E. Baxter and his father that if he got mad at

any of the Baxter family he would shoot them. Other facts will be noted as necessary in the course of the opinion.

■ I. (a) The first five assignments in the motion for new trial have to do with the grand jury which returned the indictment, it being stated that the facts alleged first came to the defendant's knowledge after the trial of the cause. Assignment No. 1 is that the grand jury was not properly selected, chosen and summoned. The defendant is foreclosed on this assignment by Sections 3514 and 3515, Revised Statutes 1929, which allow such challenges to be made only before the grand jury is sworn, and then only on the grounds specified therein. These statutes are controlling even though the defendant did not know a grand jury was being summoned, or that he was under investigation. [State v. Christopher, 327 Mo. 1117, 1120, 39 S. W. (2d) 1042, 1043.] Furthermore, the assignment makes no specification of facts but states merely a legal conclusion. This is insufficient under the new trial statute. [Sec. 3735, R. S. 1929.]

(b) The second assignment is that the grand jury was not properly charged as required by law. The record brought up by the defendant recites the grand jury "was charged by the court." There is no showing in the motion or anywhere in the record as to what that charge was. This assignment also presents only a pure conclusion without any disclosure of the facts on which it is based, and therefore fails to comply with Section 3735.

(c) The third assignment complains that the defendant was denied an opportunity to be present and challenge the grand jury. Conceding this assignment would be good as a matter of law if the defendant actually requested and was refused such an opportunity (and had timely raised the point), State v. Warner, 165 Mo. 399, 65 S. W. 584, 88 Am. St. Rep. 422, there is no proof of the *fact*. The motion does not prove itself, the record does not show it, and no affidavits or testimony were presented to substantiate the charge. A defendant's mere absence when a grand jury is sworn, is not a *denial* of his right to make challenges. [State v. Bobbst, 269 Mo. 214, 222, 190 S. W. 257, 259.] For obvious reasons the law does not contemplate or require that every defendant indicted shall receive notice that a grand jury will be called to consider his case. Indeed, the statute forbids disclosure of the fact that an indictment has been returned until the defendant has been arrested. [Secs. 3547, 3548, R. S. 1929.]

■ (d) The fourth assignment is that the grand jury had no evidence before them on which to base an indictment; the fifth assignment says they did not have sufficient evidence. The defendant's specific contention is as follows. The record shows a grand jury was ordered for the November Term, 1930, of the Scotland County Circuit Court. This grand jury was discharged by the

court on November 19 during that term. Eight days later, on November 28, at the same term a new grand jury was ordered. This second grand jury was composed of the same members as the former one. At the hearing on the motion for new trial the defendant called the foreman of the grand jury as a witness, and sought to prove that all the evidence upon which the indictment was based was presented only to the first grand jury, and that the second grand jury returned the indictment without hearing any further evidence, in the belief that they had merely recessed or adjourned over from their first session. The foreman admitted he thought the grand jury had recessed, and that he did not remember of their being sworn the second time. But he denied evidence was introduced only before the first grand jury, saying his recollection was that the second grand jury heard one witness and considered a letter and some photographs sent by the ballistics expert. By implication, however, he admits they took into consideration evidence heard while there were sitting as the first grand jury. He testified that at the conclusion of their first session they wanted "more evidence."

It has been held the life of a grand jury ends with the term of court for which it was called, but it may adjourn from time to time during that term. [State v. Brown, 195 Mo. App. 590, 194 S. W. 1069.] It would therefore have been proper for the first grand jury in this case to have recessed and reconvened in adjourned session as the foreman thought they did do, because all their proceedings at both sessions were during the same November Term, 1930, of the Scotland County Circuit Court. Indeed, this probably would have been the better course, since Section 3531, Revised Statutes 1929, in terms allows the calling of a second grand jury at the same term of court only when an offense has been committed or discovered after the first grand jury has been discharged. But we are bound by the record recitals that the first grand jury was discharged and that the members thereof were sitting as a new grand jury when the indictment was returned. [State v. Gowdy, 307 Mo. 352, 270 S. W. 310.]

State v. Grady, 84 Mo. 220, does hold, in line with defendant's fourth assignment, that if a grand jury return an indictment without having any evidence before it as to the guilt of the accused, on proper proof of that fact the indictment will be quashed. This decision was followed in State v. Cole, 145 Mo. 672, 673, 47 S. W. 895; State v. Faulkner, 185 Mo. 673, 695, 84 S. W. 967, 973; State ex rel. McCutchan v. Cooley, 321 Mo. 786, 791, 12 S. W. (2d) 466, 467. But the defendant's proof does not bring him within that line of decisions. The foreman's testimony was that the second grand jury did hear *some* evidence. On that point the Grady case, supra, further holds that "in such an inquiry the question is not as to the

sufficiency of the evidence before the grand jurors, for of that they are the judges, but it is whether they had before them any evidence at all. If it were otherwise, it would result that the court would become the tribunal to indict, as well as the tribunal to try the case.'' [See, also, State v. Privitt, 327 Mo. 1194, 1198, 39 S. W. (2d) 755, 756.] It therefore follows that these two assignments cannot be sustained.

They are not good, in our opinion, for another reason. It has been several times held an indictment cannot be impeached in this manner by the members of the grand jury who returned it. On such questions they are not competent witnesses, notwithstanding the provisions of Sections 3533 and 3535, Revised Statutes 1929. [Tindle v. Nichols, 20 Mo. 326; State v. Baker, 20 Mo. 339; State v. Grady, 84 Mo. l. c. 224; State v. Cole, 145 Mo. l. c. 673, 47 S. W. l. c. 896; State v. Faulkner, 185 Mo. l. c. 695, 84 S. W. l. c. 973.] In disposing of defendant's contentions on the two grounds just mentioned, we are not to be understood as holding a defendant can raise questions of this character for the first time in a motion for new trial.

II. The sixth assignment is that the court erred in admitting the testimony of the witness Frank Collins because his name was not indorsed on the indictment. The name of *George* Collins does appear on the back of the indictment as a witness for the State. The prosecuting attorney stated in open court he had made a mistake in writing the first name as George, and Mr. Collins testified he had been a witness at the first trial of the case and had been examined and cross-examined. His testimony at the instant trial was short and merely to the effect that as a hardware merchant he did not carry in stock cartridges for a .22 Winchester automatic rifle such as the defendant owned, but had sold them on special order to the defendant and two other men in the community. In view of these undisputed facts there is no merit in the assignment. The statute, Section 3544, Revised Statutes 1929, expressly provides witnesses whose names are not indorsed on the indictment may be used by the State; there is not the slightest evidence of bad faith on the part of the prosecuting attorney; and the defendant did not and does not claim surprise.

III. It will be recalled that when Barnett Baxter was killed he was sitting at the supper table reading an old letter he had written his parents. The letter, dated in October, 1928, was introduced in evidence. It had five blood stains on it which Mrs. Baxter, mother of the deceased, said were some of her ''son's life blood.'' The letter is set out in the record, but there is no showing as to whether it was read to the jury. Its *contents* had no bearing on any issue

at the trial except, possibly remotely this. The deceased told his father therein he would send him $25 next month and more if he had to have it. Defendant's counsel at another time during the trial sought to show the deceased owed his father's estate, apparently intimating he might have been shot as the result of a family quarrel. To this extent the letter was favorable to the defendant.

Defendant objected to the introduction of the letter as incompetent, irrelevant and immaterial and also on the ground that its admission would be "prejudicial," and that it was offered with that intent and for that purpose. In his motion for new trial the defendant merely complains that the court erred in admitting the letter over his objections, without giving any reasons. It is very doubtful if this assignment is sufficiently specific under the new trial statute, Section 3735. Obviously it cannot be given a broader meaning and effect than the trial objection upon which it was based, State v. Layton, 332 Mo. 216, 58 S. W. (2d) 454, 457; and the vague objection at the trial that the letter was "incompetent, irrelevant and immaterial" even if imported into the new trial assignment would be insufficient to preserve any question for appellate review. [State v. Bunch, 333 Mo. 20, 62 S. W. (2d) 439, 443.]

But the objection further specified that the admission of the letter would be prejudicial to the defendant and that it was offered for that purpose. Conceding without deciding the objection and assignment are to this extent good, they mean, we take it, that the bloodstained letter would have a tendency to inflame the jury. The rule in this State is that "demonstrative evidence of this character is admissible if it tends to connect the accused with the crime, or to prove the identity of the deceased, or show the nature of the wound, or throw any relevant light upon a material matter at issue." [State v. Porter, 276 Mo. 387, 396, 207 S. W. 774, 777.] This case further holds the admission of such evidence must be left largely to the discretion of the trial court; but that when "the *corpus delicti* is admitted, there is no question as to the identity of the deceased, and the fatal character of the wound has been fully shown," exhibition to the jury of the clothing of the deceased worn at the time of the homicide, or other like articles, is not justified—since it is calculated improperly to influence and inflame their minds.

Applying the foregoing doctrine, the admission in evidence of clothing worn by the victim of an assault or homicide, or clothing worn by the defendant, or other similar articles, was held proper in State v. Tarwater, 293 Mo. 273, 289, 239 S. W. 480, 484; State v. Mitchell (Mo.), 262 S. W. 717, 718; State v. Schmittzehe (Mo.), 3 S. W. (2d) 235, 238; State v. Stogsdill, 324 Mo. 105, 128, 23 S. W. (2d) 22, 30; State v. Gaters (Mo.), 39 S. W. (2d) 548, 550. And in the following decisions, under the exception to the rule the exhibition of such articles to the jury was condemned and held error:

State v. Creed, 299 Mo. 307, 318, 252 S. W. 678, 681; State v. Rennison, 306 Mo. 473, 484, 267 S. W. 850, 853; State v. Pearson (Mo.), 270 S. W. 347, 351; State v. Clough, 327 Mo. 700, 707, 38 S. W. (2d) 36, 39.

But the Missouri cases do not expressly mention one element that has received consideration in several decisions from other states. When a defendant enters a plea of not guilty and stands trial in a criminal case he is clothed with the presumption of innocence, and the State is required to prove every fact necessary to establish his guilt beyond a reasonable doubt. He may sit mute, admitting nothing and ready to assail the State's case all along the line. In discharging its burden the State is entitled to show the circumstances immediately attending the homicide as a part of the *res gestae.* Since, as all our cases concede, the introduction in evidence of bloody clothing or other articles connected with the killing is proper when there is an issue on which it will throw light, then why may the State not assume the defendant will hold it strictly to its burden, and why should it not avail itself of all such evidence in presenting its case in chief—unless the defendant by proper admission concede the facts such articles would tend to prove and thereby take those issues out of the case? It has been held in other jurisdictions the State does have that right—sometimes even where the defendant attempted to forestall it by making an admission of fact, where the exclusion of the evidence would blunt the effect of the State's case.

It is said in 13 Ruling Case Law, Section 231, page 929: "But it certainly would seem that whenever the production of clothing, in the light of the whole case, will aid the jury in arriving at the very truth of the matter in controversy, the court should not hesitate to admit its production and exhibition." And in 16 Corpus Juris, section 1221, page 617, "While improprieties in the introduction of real evidence should be guarded against, gruesome evidence cannot be suppressed merely because it may strongly tend to agitate the feelings of the jurors." Likewise, 2 Wigmore on Evidence (2 Ed.), section 1157, page 682, says: "It is to be doubted whether the necessity of thus demonstrating the method and results of the crime should give way to this possibility of undue prejudice. No doubt such an effect may occasionally and in an extreme case be produced; and no doubt the trial court has a discretion to prevent the abuse of the process. But, in the vast majority of instances where such exception is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the courts."

In State v. Winter, 72 Iowa, 627, 631, 34 N. W. 475, 478, the Supreme Court of Iowa said: "It may be true that but little question was made on the trial as to the fact of the killing; still the burden was on the state to prove that fact. Defendant's plea of

'not guilty' put in issue every allegation of the indictment, and, if the prosecutor had failed to prove the killing, defendant would have been entitled to an acquittal. As the prosecutor was required to prove that fact, he had the right to introduce any competent evidence which tended to prove it. The clothing showed the location of the wound, and its consequent fatal character. It was therefore competent evidence of the fact." [See, also, State v. Lewis, 139 Iowa, 405, 407, 116 N. W. 606, 607.]

In State v. Moore, 80 Kan. 232, 234, 102 Pac. 475, when the clothing of the deceased was offered in evidence defendant's counsel sought to prevent its exhibition to the jury by stating to the court "that no evidence would be introduced on the part of the defense concerning the shooting," but the garment nevertheless was received as an exhibit. The Supreme Court of Kansas held this proper, saying: "The bare admission of the killing subtracts little from the issues, and it may be very important for the state, with the burden resting upon it to establish all the charges of the indictment or information beyond a reasonable doubt, to make its own case in its own way; and the evidence may be very valuable in illustrating or establishing other material facts. Beyond this, the statement under consideration was too carefully guarded. It did not admit the shooting or any other fact connected with the homicide, not even that appellant's wife was dead. Its import was merely that whatever the State proved relating to the shooting would not be contradicted, and the burden still rested on the State to prove every fact alleged in the information beyond a reasonable doubt."

In Adams v. State, 48 Tex. Cr. Rep. 452, 93 S. W. 116, 118, the State offered the deceased's trousers in evidence with a knife cut therein for the announced purpose of showing the size of the knife blade which did the stabbing. Appellant's counsel interposed that "they raised no issue on that point." Notwithstanding this the evidence was held admissible, the court saying the defendant's admission "would not preclude State's counsel from insisting upon establishing his theory by positive and unequivocal evidence." [See, also, Dobbs v. State, 54 Tex. Cr. Rep. 550, 113 S. W. 923, 926.]

In Saunders v. State, 4 Okla. Cr. Rep. 264, 111 Pac. 965, Ann. Cas. 1912B, 766, 770, when the clothing of the deceased was offered in evidence defendant's counsel objected saying "there has been no dispute raised as to the mortality or location of the wounds." It was held the trial court ruled correctly in admitting the garments and that the prosecution should not be deprived of such corroborating evidence and forced to rely solely on the oral testimony of doctors and eyewitnesses. [See note appended to case, Ann. Cas. 1912B, p. 775.]

2 Wharton's Criminal Evidence (10 Ed.), section 518-a, page 1072, says where such demonstrative evidence "is offered to prove

a minor fact, capable of being equally as well proven by other testimony, and the production of the object would be attended by prejudicial results, it should be rejected. But where it is competent, and has a direct bearing upon the issue, it is not to be excluded because of its other effects on the jury." We will not go to the length of saying that demonstrative evidence of this character never should be excluded, sometimes even when there is an actual controversy about the facts of the killing on which it might tend to throw some light. Perhaps as Wharton says, if it has only a slight tendency to prove the fact but is likely to stir the emotions of the jurors, and the same showing can be equally well made by the State in some other way, the trial court in the exercise of a wise discretion may reject it.

But in the instant case the circumstance that the deceased was sitting at a table reading a letter had a bearing. The blood spotted letter was a physical object which tended to corroborate the testimony of the family as to how the killing occurred. That the deceased was shot while he was so engaged tended to show malevolence on the part of the assassin, and fit in with that part of the State's case showing the mental attitude of the defendant and his feeling toward the deceased. The defense had assailed the credibility of the deceased's mother and sister by asking if they had not sworn differently at the first trial of the case. There were intimations that the homicide might have resulted from a family quarrel because the deceased owed his father's estate, or have been committed by the two men from Chicago who were apprehended the next morning in company with the divorced wife of the deceased. The letter was offered by the State as a part of its case in chief and defendant's counsel merely objected that it was "prejudicial" and offered for that purpose, without announcing that the defense would be confined to an alibi and that the facts attending the killing would be conceded. No dramatics marked the introduction of the letter, nor was there any improper argument later, so far as the record shows. We think there was no abuse of the trial court's discretion in admitting the letter in evidence.

IV. The next assignment is that the trial court erred in admitting the bullet offered in evidence as the fatal bullet, because it was not sufficiently identified or shown to be in the same condition as when first obtained. We stated in the beginning that the defendant had filed no brief in this case. That is true, but his counsel have filed a two-page typewritten paper entitled "Suggestions in Reply to Respondent's Statement." This paper is directed to this particular assignment and argues that the testimony fails to trace the evidence bullet as it passed from hand to hand and to show it

was the bullet which killed Baxter. For this reason we must review the testimony.

Dr. Gerwig, who performed the post-mortem, turned the bullet over to the then prosecuting attorney, W. M. Raines. Mr. Raines gave the bullet to Dr. E. E. Parrish, the coroner, when the latter held a coroner's inquest on August 25. Dr. Parrish kept the bullet a while and says he turned it over to Mr. Harold M. Jayne, an attorney at law, who was assisting the prosecuting attorney at that time but who later represented the defendant in the trial of the case. Sheriff Myers, however, testified Coroner Parrish gave the bullet to him (in other words, there is a conflict between the testimony of Dr. Parrish and that of the sheriff, the former saying he gave the bullet to Jayne and the latter that the bullet was given to him).

In the latter part of September, it seems, suspicion of the defendant's guilt began to grow stronger, and it was decided to obtain some bullets known to have been fired from his rifle to submit to a ballistics expert for comparison with the fatal bullet. Two brothers named Anderson were paid $25 each by somebody to slip into the defendant's house during his absence, get his rifle, and obtain the necessary test bullets. They did so, firing the gun three times into a box or tank of water and recovering the bullets, which they turned over to Sheriff Myers. The sheriff also had the two bullets which had been experimentally fired into the cave the morning after the homicide. Later in the fall, at a, date not given, Attorney Jayne, then still assisting Prosecutor Raines, got three bullets and a .22 rifle from Sheriff Myers and took them to St. Louis where he submitted them to a ballistics expert. The latter told him two of the bullets had been shot through something that removed the markings thereon. So Mr. Jayne brought all three bullets back to Scotland County and turned over one of them to Prosecutor Raines and kept the other two. He testified he did not know which one of the three he gave to Raines, but he admitted the three bullets did not look alike and that the two he retained were the two the expert had told him were devoid of markings.

Mr. Raines, the prosecuting attorney, swore the bullet introduced in evidence as the fatal bullet was the one Mr. Jayne returned to him after going to St. Louis, and also that it was the one he had received from Dr. Gerwig after the post-mortem and later turned over to Dr. Parrish at the coroner's inquest. Sheriff Myers identified it as one of the three bullets he had received from Coroner Parrish and turned over to Mr. Jayne; and Coroner Parrish identified it as the bullet Prosecutor Raines had turned over to him at the inquest. Three photographs of the evidence bullet appear in the record in connection with the testimony of the ballistics expert. They show it to be noticeably mashed or battered at the nose, somewhat twisted, and chipped away or bent in toward the base. The sheriff said he

could tell it by its shape, markings and a substance thereon. Mr. Raines identified it by a mark going clear around it and some tissue at the base. After the bullet was returned to him he placed it in a safety deposit box and took it to Chicago where he submitted it to Captain Waird and Col. Goddard of the Scientific Crime Department Bureau in that city. These experts scratched their identification mark on the base thereof, but Mr. Raines testified that otherwise it was in the same condition as when he first got it. The bullet had not, however, been in his possession between the first and second trials. We think this evidence was amply sufficient to justify the trial court in admitting the bullet in evidence as it did. The testimony of Mr. Raines alone identifies it as the bullet coming from Dr. Gerwig, the physician who extracted it from the skull of the deceased.

V. The next assignment is that "the court erred in admitting all the evidence of State's witness, Seth Waird, over the objections of defendant." In State v. Majors, 329 Mo. 148, 156, 44 S. W. (2d) 163, 166, an assignment of this character was held too general under the new trial statute, Section 3735, because it failed to specify what particular part of the witness's testimony was complained of, and on what grounds the complaint was based. In view of the fact that this witness was the ballistics expert and all his testimony was along that line, we might, perhaps, be inclined to give consideration to this assignment if the defendant had made a *general* objection below assailing the witness in his character as an expert or questioning the probative value of ballistics evidence. But the defendant did not do that. The testimony of the witness covers forty-six pages of the transcript. It is interspersed with numerous objections to particular questions on particular grounds, but we find no general objection except that the evidence bullet, concerning which the witness was testifying, had not been properly identified, and we have already ruled that objection was properly overruled. However, we will say that while the question is a new one in this State, we are satisfied the rights of the defendant were not prejudiced by the admission of the ballistics testimony. It has been held competent in a number of other jurisdictions when given by a qualified expert. [Evans v. Commonwealth, 230 Ky. 411, 19 S. W. (2d) 1091, 66 A. L. R. 360, note, p. 373; People v. Bolton, 215 Cal. 12, 8 Pac. (2d) 116, 120; State v. Campbell, 213 Iowa, 677, 239 N. W. 715, 719; People v. Fisher, 340 Ill. 216, 237, 172 N. E. 743; People v. Myering, 345 Ill. 598, 178 N. E. 122, 125.]

VI. The tenth assignment is that it was error to refuse to permit the defendant to read the letters passing between the deceased and the defendant's daughter Pauline Shawley in the order

in which they were written. These letters had already been offered in evidence by the State. What the defendant really wanted to do, as the record shows, was to reintroduce and reread them in chronological order as a part of the defendant's case. The court did not commit error in denying this request. They were already in evidence and defendant's counsel could have made such use of them in argument as they saw fit. Furthermore, the record shows that when the court refused to permit the letters to be read a second time during the trial, the defendant neither objected nor excepted.

VII. The next assignment predicates error on the action of the trial court "in permitting witness, Emery Baxter, to testify to statements made by the defendant more than six months prior to the time of the alleged killing." The statement complained of was made to the witness, a brother of the deceased, and their father, and was as follows: "Dave, if I ever get in any trouble with you or your boys, the first thing I would do would be to shoot you." The sole ground of objection, as made in the above assignment, appears to be that the statement was too remote—at any rate that was the only objection made at the trial below. This contention is without merit. In State v. Adams, 76 Mo. 355, 357, it was held that conditional threats made two months or more before the homicide were admissible, and that the competency of the threats was not affected by their nearness or remoteness. In State v. Grant, 79 Mo. 113, 137, 49 Am. St. Rep. 218, where a policeman was killed, threats made by the defendant about two years before against policemen generally if they tried to arrest him again, were held properly admitted in evidence. In State v. Glahn, 97 Mo. 679, 689, 11 S. W. 260, 263, some of a series of threats proven had been made thirteen years before the homicide. [See, also, State v. Stallings, 326 Mo. 1037, 1046, 33 S. W. (2d) 914, 917.]

VIII. Assignments 12 and 13 in the motion for new trial merely charge generally that the court erred in giving certain instructions, designated by number. No reasons are given. These assignments have so often been held insufficient under the new trial statute, Section 3735, that we shall pass them by without further reference. The same is true of assignment No. 25, which merely charges that the verdict was against the law and the evidence and the law under the evidence. Assignments 15 and 16 are predicated on prejudicial argument made by counsel for the State. But as the argument is not preserved in the record there is nothing before this court on these assignments.

IX. The fourteenth assignment is that the court should have given the defendant's instruction in the nature of a demurrer

at the close of all the evidence. The State's case is based wholly on circumstantial evidence and this question has given us great concern. We have, however, concluded that we cannot interfere.

The bloodhound testimony is very unsatisfactory; and much that might have been shown is left undeveloped. The kitchen porch was arbitrarily selected as the starting point for the dogs though the sheriff had previously stood there sighting through the hole in the screen; and no examination was made of the ground over the cave a few feet back, from which elevation it seems the shot might have been fired with less danger of detection. If the assassin stood erect on the porch within three feet or so of the door surely he would have been in plain view and the muzzle of his rifle would have been nearly against the screen; and yet the family say nothing about having seen any flash of fire, there is no testimony that the screen door showed evidences of it, and no mention is made of any smoke or smell of powder in the room. The family all say only that they heard the report of a rifle "outside."

Furthermore, the State's affirmative showing is that it had rained and the road was muddy or moist. The automobile tracks were plainly visible. Mud had been found on the fence brace. The trail led across the barn lot and along the road. The tire prints indicated the car had been going east and had turned around to go back west and south over the very road the houndmaster and sheriff had followed with the dog. And yet, it seems, no footprints were discovered anywhere and no effort was made to follow the automobile tracks. They were not even closely examined or compared with the tires on the defendant's automobile, which was there on the Baxter premises. It may be this was because the defendant was not under suspicion at that time—though events the next day indicate the contrary—and it may be the tire tracks or footprints, if there were any, could not be followed at night but, at any rate this is all undeveloped.

Another circumstance is that the defendant was mingling with the assembled group at the Baxter home through the night while the dogs were there and they paid no attention to him, though the houndmaster admitted bloodhounds could detect the scent of a person a few feet away better than by following a trail on wet ground. But it also appeared the defendant was at the Baxter home when the dogs were ordered; that after that he went back to his own home for about an hour and then returned to the Baxter place. And the houndmaster said by sprinkling red pepper on one's clothes, or by the use of witch hazel, the human or personal scent could be destroyed. Taken together, in our opinion this evidence is weak. In fact it has little, if any, tendency to connect the defendant with the crime.

The acts, conduct and statements of the defendant, however, as

detailed by the State's witnesses, do have some tendency to indicate his guilt, in connection with other testimony. To say the least, he appeared to be "high-strung" the night and morning following the homicide. He told the sheriff they were asking him "too damned many questions" and left the sheriff's car, going to his own. In his conversation with the witness Miller he failed to disclose that certain automobile tracks they had come upon had been made by his car until the witness demonstrated to him that the automobile must have been traveling in the direction of his home. According to the State's witnesses he made unsatisfactory explanations about matters coming to the attention of the officers, as when he said a certain board found torn from the fence must have been pulled loose when the fence was repaired, whereas the State's witness said the board had left a fresh splinter hanging to the fence and the fence appeared not to have been repaired for two years. The hound-master, Mr. Rodibaugh, on an examination of the defendant's rifle, the morning after the homicide, found fresh smudge in it; and when the defendant took the stand he did not attempt to account for that. His general threats and bellicose attitude may be taken as indicating malicious or criminal tendencies. [State v. Feeley, 194 Mo. 300, 315, 92 S. W. 663, 666, 3 L. R. A. (N. S.) 351, 112 Am. St. Rep. 511; State v. Parmenter, 278 Mo. 532, 539, 213 S. W. 439, 440.] And there was some evidence that he took to heart the jilting of his daughter by the deceased. W. L. Baxter testified the defendant evidenced some hostility or coldness toward the deceased while calling for the mail two hours before the homicide; and when news of the sensational shooting was broadcast about the neighborhood he was late in arriving, as of necessity he would have been if he did the shooting.

Some of the foregoing testimony was contradicted by the defendant and his family, some was ignored, and some explained. But the explanations were not always satisfying or buttressed by the corroborating testimony of witnesses outside the family, which it seems would have been procurable. Only the defendant, his wife, daughter and mother-in-law testified in his behalf. We do not say the evidence referred to in this and the preceding paragraph was strong, but it is entitled to some weight and is consistent with the theory of his guilt.

The strongest evidence against the defendant, we think, is the ballistics testimony. The defendant admitted the rifle was his. A microscopic examination of the bullet which killed Barnett Baxter indicated it had been fired through that gun. Six photographs of part of the fatal bullet brought into visual juxtaposition with parts of test bullets were introduced in evidence. We have examined them carefully. Owing to the distorted condition of the fatal bullet there is not a coincidence of the ridges and grooves clear around its cir-

cumference, but at various points the markings do correspond, and at others a relation is indicated as in the case of faults in stratified rock. We cannot, of course, pass independent, expert judgment on these photographs—no more than we could interpret X-ray photographs. But a qualified expert has testified any given rifle will leave its own peculiar, individual, microscopic markings on any bullet fired through it—no two rifles the same—and that in his opinion the fatal bullet was fired through the defendant's rifle. That rifle was found in the defendant's bedroom the morning after the homicide with fresh smudge on it, and the defendant then said, and has never since denied, no one had fired it but him. Nor did he explain at the trial why the rifle gave evidence of recent firing. Certainly this evidence in connection with the other facts was sufficient to take the case to the jury.

X. (a) The remaining eight assignments are directed to matters occurring while the jury were deliberating on their verdict. The first is that they received into the jury room improper papers and exhibits. During the trial two plats, drawn by Minerva Baxter, sister of the deceased were admitted in evidence without objection. One showed the relative location of the Baxter, Shawley and Smith homes, the houses indicated by squares with the names written thereon and the roads by straight lines. The other showed the arrangement of the rooms in the Baxter house, also the kitchen door, porch and cave. It did, however, further show the position of the dining table with two small circles marked "mama" and "Barnett," indicating where these two sat when the shooting occurred. And further, in the "living room" was a small circle marked "about where Mama sat when Shawley came in." At the hearing on the motion for new trial it was shown that the jury called for these plats during their deliberations and a deputy sheriff brought them to and left them with the jury.

Section 3734, Revised Statutes 1929, provides that "the court may grant a new trial for the following causes, or any of them: First, when the jury has received any evidence, papers or documents, not authorized by the court. . . ." It will be observed the statute says the court *may* grant a new trial, not that it shall do so regardless of whether the defendant has or has not been prejudiced by the reception of such evidence, documents or papers. The plats carried into the jury in this instance had been admitted without objection and showed nothing about which there was any real dispute. The defense was an alibi. It was held in State v. Tompkins, 71 Mo. 613, 617, a forgery prosecution, that no reversible error was committed in permitting the jury to take with them the documentary evidence in the cause. In State v. Spaugh, 200 Mo. 571, 609, 98 S. W. 55, 66, a first degree murder case, the jury occupied the circuit courtroom

during their deliberations. Two of them examined a rifle left under the clerk's desk, which had been referred to during the trial and in argument though not introduced in evidence. It was held that since no prejudice resulted to the defendant reversible error could not be predicated thereon. In People v. Anthony, 146 Cal. 124, 130, 79 Pac. 858, the jury took to their room a diagram which had been introduced in evidence. It was ruled the action of the lower court in refusing to grant a new trial on that account was proper, no prejudice appearing. [See, also, 16 R. C. L., sec. 113, p. 302; 20 A. L. R. 1202, note; 67 A. L. R. 1531, note.]

▮ (b) The next assignment complains that the jury were allowed to separate contrary to law. At the hearing on the motion for new trial it was shown by the deputy sheriff who had the jury in charge during their deliberations that they were quartered in two hotel rooms on the second floor of a building, six in each room. The two rooms were not communicating, but on opposite sides of a hall six or eight feet wide, each room having only one door which opened into the hall and the two doors being directly across from one another. Each room had outside windows facing the street and it is inferentially shown that under these windows was a porch across the front of a picture show on the first floor. Both doors were locked, the deputy sheriff retaining the keys. He lay on a cot placed crosswise of the hall between the two doors so that nobody could have entered or left the rooms without brushing against him. He was awake most of the night but may have dozed a little. No one did come or leave.

A separation of a jury under the common law meant "a departure of one or more jurors from their fellows, or all of the jurors departing from each other." [16 C. J., sec. 2530, p. 1077.] In Missouri there are three applicable statutes (italics ours), Section 3682, Revised Statutes 1929, provides that with the consent of the parties "the court may permit the jury to separate at any adjournment or recess of the court during the trial in all cases of felony, *except in capital cases.*" Under Section 3683, at the conclusion of the trial the jury "may retire under the charge of an officer who, in case of a felony, shall be sworn *to keep them together* in some private or convenient room or place." Section 3734 says, "the court *may.* grant a new trial for the following causes, or any of them: . . . second, when the jury has been *separated* without leave of the court, after retiring to deliberate upon their verdict."

Ever since the decision of State v. Orrick, 106 Mo. 111, 126, 175 S. W. 176, 179, it has been held the provisions of these statutes, especially the latter two, are mandatory to the extent that if a jury deliberating upon a felony case are not kept together and do separate without leave of court, a new trial must be granted regardless of whether actual prejudice to the defendant be proven. Whether

the court can grant such leave even with the consent of the parties in a capital case after the jury has retired to deliberate is a point not involved in the instant cause, since the separation here claimed was not authorized by the court or agreed to by the parties. The Orrick case and subsequent decisions say the purpose of the statutes is to prevent any opportunity for misconduct on the part of the jurors and to remove any ground for suspicion that improper influence may have been exerted upon them. This being so, mere proof of the separation requires the granting of a new trial. Whether there was actual misconduct is immaterial. The statutes forestall and cut off any inquiry into that question.

But granting all that, what is a keeping together and what is a *separation* of the jury within the contemplation of these statutes? When Section 3682 provides the court may permit the jury "to separate" it means the jurors may, in the circumstances mentioned, disperse and go to their several homes or about their business. Does the requirement of Section 3683 that the jury be kept together after they retire to deliberate and the prohibition in Section 3734 against their separation have the narrow, restricted meaning that a mere physical separation of the jurors into different rooms during the hours set aside for rest and sleep, even though they remain in the custody and under the surveillance of a sworn officer, requires the granting of a new trial? We think not, under the great weight of authority, although there are cases to the contrary.

In State v. Asbury, 327 Mo. 180, 36 S. W. (2d) 919, a murder case, the jurors slept in five nonconnecting hotel rooms, three of which adjoined and the other two being around the corner on a cross-hall on the same floor. Four jurors were in one room and two jurors in each of the four other rooms. The deputy sheriff slept in one of the latter rooms with two of the jurors. The doors of all five rooms were left open. During the night two of the jurors went to a toilet at the end of the hall with the deputy sheriff's knowledge, but unaccompanied by him. He did not know how many jurors might have done that while he was asleep. Other guests of the hotel were occupying rooms on the same hallway and floor. It was held this violated the requirements of the statute because: (1) the jurors were not kept under the surveillance of the officer; (2) and also because they had an opportunity *improperly to influence each other*. In other words, this second reason given amounted to saying the panel cannot be broken up into groups occupying different nonconnecting rooms for sleeping purposes. The writer hereof concurred in the Asbury opinion but is now convinced the holding therein was wrong, as to said second reason given, although there are several other cases from other jurisdictions to the same effect. [Commonwealth v. Shields, 65 Ky. 81, 83; State v. Walters, 135 La. 1070, 1104, 66 So. 364; State v. Pascal, 147 La. 634, 639, 85 So.

621; People v. Adams, 143 Cal. 208, 76 Pac. 954, 66 L. R. A. 247, 101 Am. St. Rep. 92.] In the two Louisiana cases, however, the decision rested not alone on the circumstance that the jury were divided into groups, but the fact is stressed that they were so separated as to make it impossible for the officer in charge to keep all of them under his surveillance.

In State v. Schaeffer, 172 Mo. 335, 343, 72 S. W. 518, 520, a first degree murder case during the trial (but not after they had retired to deliberate) the jury were quartered in four, separate, noncommunicating rooms and the sheriff and his deputies in two others, all on the same floor and hallway of a hotel. They carried their own room keys and were left free to come and go as they pleased. The opinion says: "the acts of the officers in charge of the jury in this case in permitting them to occupy separate rooms with no doors between them, and to mingle with other persons during the trial, is certainly not to be commended and should not be permitted if possible to prevent it, which could have been done in this case."

These seem to be the only two Missouri cases bearing on the question, but in Adkins v. Commonwealth, 197 Ky. 385, 391, 247 S. W. 26, 29, the facts were much like those in this case. A headnote summarizing the court's ruling is as follows: "Not reversible error for jury to be quartered in two rooms, six in each, overnight, when it affirmatively appears that the outer doors were locked and the inner doors closed, and that the sheriff's bed was stationed so that no one could enter or leave their room without passing him, and it further appearing that there was no communication of any kind with them either had or attempted to be had."

Section 13878, Iowa Code 1924, provides that when the jury retire, "one or more officers must be sworn to keep them together in some private and convenient place without food or drink, water excepted, unless directed by the court." In State v. Albery, 197 Iowa, 538, 542, 197 N. W. 650, 652, a felony case, three women members of the jury were locked in a separate room for the night by the sheriff. The remaining jurors, who were men, were locked in the jury room. The sheriff took his station between the doors of the two rooms, in a hall about ten feet wide. He remained awake and on guard, and knew no person entered or left either room and that no one talked to or communicated with the members of the jury. The Iowa Supreme Court held this was proper saying: "This statute, like all statutes, must receive a reasonable construction. It cannot always be literally and strictly obeyed."

In Forester v. State, 36 Okla. Cr. Rep. 111, 252 Pac. 861, 863, the court said: "In a capital case, where the necessity of accommodating the jury requires a division in the use of sleeping quarters, such separation is not the separation contemplated by the statute."

There are many other decisions of like tenor. In substance their

holding is that the mere physical separation of the jury for sleeping purposes in case of necessity or for their better accommodation, does not violate a statute forbidding a separation provided they remain in the custody and under the surveillance (not necessarily ocular) of the officer in charge of them. [Wright v. State, 35 Ark. 639, 646; People v. Bush, 68 Cal. 623, 627, 10 Pac. 169; Minor v. Commonwealth, 5 Ky. Rep. 176; State v. Garig, 43 La. Ann. 365, 370, 8 So. 934; State v. Devall, 51 La. Ann. 497, 499, 25 So. 384; State v. Spears, 134 La. 483, 64 So. 385, Ann. Cas. 1916A, 250; State v. Trull, 169 N. C. 363, 368, 85 S. E. 133; Carmack v. State, 44 Okla. Cr. Rep. 171, 279 Pac. 964, 967; Com. v. Manfredi, 162 Pa. 144, 150, 29 Atl. 404; Kennedy v. Commonwealth, 2 Va. Cas. 510, 512; Thompson v. Commonwealth, 49 Va. 637; State v. Robinson, 20 W. Va. 713, 763, 43 Am. St. Rep. 799. See, also, 16 R. C. L., sec. 117, p. 308; 34 A. L. R. 1204, 1226, note; 24 L. R. A. (N. S.) 776, note; 103 Am. St. Rep. 169, note.]

We think the proof that there were windows in these second-story hotel rooms with a porch under them, cannot fairly be said to support a charge that the jury *separated*, or were not kept together. We suppose the defendant would have us infer the jurors might have climbed out the windows and from the porch to the public street; or that some person might have climbed up on the porch and thus have put himself in a position to communicate with the jury. But in the circumstances that assumption is too violent and far-fetched to indulge. Indeed, the record does not show what kind of a porch was under the windows—whether it had support reaching to the ground, or extended to the other hotel windows. While the deputy sheriff was on the stand he testified no one except the jurors was in either room while he had them in charge; that it would have been impossible for anybody to have entered without brushing against him, or without his hearing it; that nobody communicated with them so far as he knew; that the jurors did not raise the windows so far as he knew.

(c) The motion for new trial also charges the jury was permitted to walk around the streets and to loiter in public places. In the hearing on the motion it was shown through the deputy sheriff as a witness that after the conclusion of the testimony he took the jury first to the jury room, then to supper, and then in a body out on the courthouse lawn where he sat with them for about two hours until they went to bed about nine P. M. No one had any contact with them during that time. It does not appear whether the jury had then received the instructions of the court, heard the argument of counsel and retired to deliberate upon their verdict. But whether this be true or not, while it was an indiscretion it was not a separation. And if the jury had not retired to deliberate, the affirmative proof that the jury were not approached disposes of the

point. See State v, Jeffries, 210 Mo. 302, 328, 109 S. W. 614, 622, 14 Ann. Cas. 524, where the sheriff took the jury to a theater.

 (d) Two other assignments charge the jury received packages and communications from unauthorized persons. The proof on the motion shows that the family of one juror sent word to him through the deputy sheriff that they were all right. Also on Saturday afternoon the wife of another of the jurors sent him a bundle, which was left with a Mr. Huggans in town. The latter called the deputy sheriff to come for it, which he did, and delivered it to the juror without inspecting its contents. It is to be regretted that sworn officers in charge of juries, especially those deliberating on capital cases, will thus fail in the discharge of their important duties. The arduous labor of court and counsel in long trials such as this, with the attendant expenditure of time and money, all may be set at naught to the ultimate prejudice of both parties, by a single improper act. An apparently innocent message delivered to a member of a jury possibly could have a secret significance; and the risk in permitting the delivery of sealed letters or uninspected packages is obvious. There should be no communication with the jury except under the direction of the court. However, dependent as our criminal trial system is upon jurors and bailiffs unlearned in the law, errors will creep in, though we do not recall a case where there were so many as in this one.

It is said in 16 Corpus Juris, section 2672, page 1164: "Defendant is not entitled to a new trial merely because jurors received and read letters addressed to them during the trial, if he was not prejudiced, or, according to some authorities, where prejudice is not shown; but it is otherwise if it appears that he was prejudiced, and some cases hold that prejudice will be presumed unless the prosecution shows the contrary." But the possibility of improper influence being exerted through a sealed letter to a juror seems to us stronger than would be true in the case of a bundle or package, since the latter would hardly be turned over to a sworn officer for delivery to a juror except in the expectation that it would be inspected. Furthermore, in the instant case the defendant's own showing is that the bundle came casually from the wife of the juror on Saturday afternoon in circumstances which called for and would have been susceptible of further evidential development if there had been anything sinister in them. We have been able to find only one case that seems to be in point. In Com. v. Thompson, 4 Phil. Rep. 215, 220, the defendant was convicted of first degree murder. In his motion for new trial he complained of a separation of the jury during the trial. The proof showed that as the jury were passing through the vestibule of the Law Building one of the jurors lagged behind and had a brief conversation with his wife, he and she both testifying that her only purpose was to inquire how

he was and to furnish him with a change of clothing, nothing being said about the pending trial. It was held the separation did not vitiate the verdict. Without in the least condoning the practice and granting the burden is on the State to disprove prejudice where the reasonable possibility thereof is shown, we are constrained to hold the improprieties complained of here, on their facts were not such as to call for a new trial as a matter of law. The trial judge passed on these questions. Some measure of discretion must be confided to him since he is in a much better situation to acquaint himself with the actual situation. [State v. Taylor, 134 Mo. 109, 161, 35 S. W. 92, 105; State v. Cushenberry, 157 Mo. 168, 183, 56 S. W. 737, 743; State v. Page, 212 Mo. 224, 240, 110 S. W. 1057, 1061; State v. Sebastian, 215 Mo. 58, 89, 114 S. W. 522, 531.]

 (e) A further assignment is that the court erred in communicating with the jury while not in open court or in the presence of the defendant. The deputy sheriff testified in answer to a question that he recalled the court's sending word to the jury on the last day they were out about three o'clock in the afternoon, before court had opened. Court convened just before the jury was ready to report. This is all the record shows. There was no effort to prove what communication the court sent to the jury. The circuit judge is entitled to the presumption of right action. Appellate courts in such circumstances rightfully exact of a defendant complaining by motion for new trial after conviction, that the grounds of his complaint be set out as fully as may be. [State v. Page, 212 Mo. l. c. 240, 110 S. W. l. c. 1061.] This assignment and the evidence in support of it present nothing tangible for review.

 (f) Finally it is charged in the twenty-third and twenty-fourth assignments in the motion for new trial that "the verdict was not the free concurrent of the jurors;" and that "the jury was kept an unreasonable length of time and their verdict was the result of coercion." There is nothing in the record to substantiate this. The trial took three days. The jury was out two days. It was a circumstantial case with many facts to sift. State v. Rose, 142 Mo. 418, 428, 44 S. W. 329, 332, ruled that holding a jury in a murder case for four days was not an abuse of discretion. [See 85 A. L. R. 1422, note.]

We have reviewed all the assignments in the defendant's motion for new trial and find no reversible error. The judgment is accordingly affirmed. All concur.